Tracey Zephier (SD Bar #3058)
408 Knollwood Drive
Rapid City, SD  57701
(605) 791-3999
tracey@ndncollective.org

Bruce Ellison (SD Bar # 462)
P.O. Box 2508
Rapid City, SD 57709
(605) 858-1850
Bruce.Ellison4@gmail.com

Roger Flynn (CO Bar #21078) *Pro Hac Vice Application To Be Filed*
Jeffrey C. Parsons (CO Bar #30210) *Pro Hac Vice Application To Be Filed*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| NDN COLLECTIVE; BLACK HILLS CLEAN WATER ALLIANCE; EARTHWORKS,   ) <br><br>    Plaintiffs,      ) <br><br> v.              ) <br><br> UNITED STATES FOREST SERVICE; <br> U.S. DEPARTMENT OF AGRICULTURE; <br> JAMES GUBBELS, District Ranger,  ) <br><br>    Defendants.     ) | Case No.:  26-cv-5035 <br><br> COMPLAINT FOR VACATUR, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF |

**INTRODUCTION**

1. Plaintiffs NDN Collective (NDN), Black Hills Clean Water Alliance (BHCWA), and Earthworks, file this suit for vacatur, and equitable, declaratory and injunctive relief under the Administrative Procedure Act (APA), 5 U.S.C. §§701-706, the National

1

Environmental Policy Act (NEPA), 42 U.S.C. §§4321 *et. seq.*, and their implementing regulations and policies, challenging the decisions of the United States Department of Agriculture's Forest Service (USFS) to approve the Rochford Exploration Drilling Project (Project or project), a large mineral exploration drilling project on USFS-managed public lands directly affecting Pe'Sla, a recognized Native American sacred site and place of ceremony.

2.     Pe'Sla is sacred to the Lakota, who have visited the site for countless generations.  It is actively utilized for prayer, ceremony, and cultural activities.  Pe'Sla is recognized as an Indigenous sacred site by various Tribes, the federal government, State of South Dakota, and Pennington County.

3.     Despite the overwhelming evidence submitted to the agency by Plaintiffs and numerous Native American Tribes that the Project would directly and significantly affect Pe'Sla, the U.S. Forest Service "categorically excluded" the Project from the proper environmental, public, and cultural resources review required by NEPA.

4.     Despite the significant adverse impacts to Pe'Sla, water, and other important public resources resulting from the drilling project, the USFS purported to comply with NEPA via a cursory "Categorical Exclusion" (CE), which severely limited public and agency review of the Project.  By relying on a CE where "extraordinary circumstances"—significant impacts to recognized Native American sacred sites—were present, the USFS violated NEPA.

5.     The agency also violated NEPA by relying on a CE that on its face does not apply to this Project.  The CE the agency relied upon is for "Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than 1 mile of low standard road, or use and minor repair of existing roads." 36 C.F.R. §220.6(e)(8)("CE-8")(repromulgated in July 2025 at 7 C.F.R. §7.1.b.4(d)(32)).  Yet the approved mineral operations, by the agency's own admission, will last more than one year, as the required reclamation of the exploration impacts will last up to three years, if not longer, after completion of the initial drilling activities.

6.     The Defendant USFS approved the drilling project via a Decision Memo (Decision) issued by USFS Mystic District Ranger James Gubbels on February 27, 2026.

7. The Decision authorized the Project proponent, "Pete Lien and Sons, Inc." ("PLS") to conduct extensive mineral exploration drilling, road construction and reconstruction, reclamation, and other ground-disturbing operations on public lands in and adjacent to Pe'Sla.[1]

8. As detailed below, this obvious attempt to shield the agency's decisions from full public review violates NEPA and its implementing regulations.

9. For these and the related reasons addressed herein, Plaintiffs ask this Court to declare that the Decision, project approvals, and application of the inapplicable CE violate federal law. Plaintiffs further ask this Court to set aside/vacate and remand the Decision to the USFS, and enjoin any construction, operation, or development of the Project until the violations have been corrected.

### JURISDICTION AND VENUE

10. This is a suit pursuant to the APA, NEPA, and federal regulations and requirements. Jurisdiction over this action is conferred by 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief).

11. Venue is proper in the District of South Dakota pursuant to 28 U.S.C. §1391(b) and (e). The USFS Mystic District Office, and named Defendant James Gubbels, who issued the Decision and project approval decision, are located in Rapid City, South Dakota. The Project would be located in Pennington County, South Dakota. Plaintiff NDN and BHCWA are based and located in Rapid City, South Dakota.

### PARTIES

12. Plaintiff NDN Collective is a 501(c)(3) non-profit organization registered in Rapid City, South Dakota. NDN Collective's mission includes educating, funding, and organizing those engaged in Native American issues. NDN Collective seeks to use trainings, leadership development, and education to prepare Indigenous communities to create sustainable outcomes for their people and the planet. NDN Collective also works to support the Indigenous

---

[1] PLS is a corporate subsidiary of Quikrete Holdings, Inc., a multi-billion-dollar materials conglomerate based in Atlanta, Georgia.

community goals of, among other things, protecting and defending their land, air, water and the planet.

13. Representatives of NDN Collective and their relatives regularly use and enjoy Pe'Sla, the project site, and adjacent public lands for cultural and religious practices. Representatives of NDN and their relatives intend on continuing to use and value the lands at, and affected by, the project during the rest of 2026 and in future years. These uses will be immediately, irreparably, and significantly harmed by the project.

14. Plaintiff Black Hills Clean Water Action (BHCWA) is a non-profit organization whose mission is to protect and restore watersheds of the Black Hills through education, public policy initiatives and legal advocacy. BHCWA staff and members regularly use and enjoy the public lands and their wildlife, cultural and natural resources for health, recreational, scientific, spiritual, educational, aesthetic, and other purposes, at the project's site. The project would be located in and have effects on lands and waters where BHCWA staff and members have enjoyed—and intend to continue enjoying in the coming months and in the future—camping, hiking, photographing natural beauty, appreciating the natural environment, clean water, and wildlife in the area. These uses will be immediately, irreparably, and significantly harmed by the projects and related operations.

15. Plaintiff EARTHWORKS is a national non-profit organization dedicated to protecting communities and the environment against the adverse effects of hard rock mining, while seeking sustainable solutions. Earthworks members regularly use and enjoy the public lands and their wildlife, cultural and natural resources for health, recreational, scientific, spiritual, educational, aesthetic, and other purposes, at and around the project's site, and have definite plans to continue these uses in the near future. These uses will be immediately, irreparably, and significantly harmed by the projects and related operations.

16. In addition to the immediate and irreparable harm to the lands and waters used by Plaintiffs and their members, caused by the Project (both the drilling aspect and the reclamation/restoration aspects of the Project) and USFS' approval of the Project, Plaintiffs, and their members, have been, and are being, irreparably harmed by USFS' failure to conduct a

proper NEPA analysis and to fully involve the public, and Plaintiffs, and their members, in the required NEPA process.  Without the public process required by law, the USFS' action is not fully-informed and overlooks serious cultural and environmental impacts that would have been brought to light had the agency completed the required process, including fully soliciting public input and considering in detail environmental impacts and alternatives.

17.    Defendant U.S. Forest Service (USFS) is an agency of the Defendant United States Department of Agriculture.  The USFS has oversight responsibility for the federal lands affected by the Project.

18.    Defendant James Gubbels, the District Ranger for the USFS Mystic Ranger District, is the Authorized Officer for the challenged Decision, project approvals, and related federal actions. He is sued in his official capacity.

**THE ROCHFORD EXPLORATION PROJECT**

19.    On June 11, 2024, the USFS received a proposed Plan of Operations (PoO) for the Project —a proposal to conduct drilling, road building, reclamation, and other operations on public lands in the Black Hills near Rochford, South Dakota. *See* USFS Decision Memo (DM) (2-27-26) at 1.  After internal review, with no public input, on April 9, 2025, the USFS issued a "scoping notification letter" to a limited set of "interested parties" (and posting on its website) seeking public input on the proposed project. DM at 22.

20.    "A total of 2,226 scoping comments were received on the project." DM at 22.

21.    With no further public review, the agency issued the DM on February 27, 2026. As approved by the DM, the project will result in "drilling boreholes at up to 18 proposed sites on NFS lands. Each drill site would be approximately 30 feet x 50 feet, or 0.034 acre in size. There would be one borehole at each site. … The maximum depth of each borehole would be 1,000." DM at 3.  "Additionally, there would be two 0.15-acre laydown/staging areas used to store core boxes, hose, spare parts, water storage tanks, and site portable sanitation facilities." DM at 3.

22.    "Access to drill sites would rely on existing National Forest System roads (NFS) or temporary access routes and overland two-track routes wherever feasible, specifically NFS roads 190 and 125 for northern sites and NFS road 132 for southern sites.  To reach pads from those roads, the proponent would implement approximately 5,050 feet of temporary overland access route improvements." DM at 3.

23.    A draft of the Project application submitted to the Forest Service proposed access route improvements totaling approximately 9,500 feet. Upon information and belief, the Forest Service worked with PLS and/or advised PLS to reduce the extent of the road development in order to attempt to fit the Project within the terms of a categorical exclusion under the agency's National Environmental Policy Act regulations.

24.    "Upon completion of drilling, all temporary access routes would be restored to pre-project conditions or as near as practicable, including recontouring, surface scarification, redistribution of salvaged topsoil and woody debris, and reseeding with a certified weed free seed mix approved by the Forest Service." DM at 3.

25.    "Drilling would be supplied with water from an approved municipal or industrial source trucked to the site.  Water would be recirculated during drilling through either in-ground infiltration galleries (excavated trenches typically 2–4 feet deep, approximately 24 inches wide, up to 20 feet long) or above-ground sump systems (double-tank or double-crib systems lined with oil-impermeable fabric), which allow cuttings and fines to settle and clarified water to be returned to the drill." DM at 3.

26.    "Project equipment will include one to three track or trailer mounted drill rigs; a water truck; pickup support vehicles; all terrain/utility vehicles; and, on an as needed basis, a compact track loader or backhoe for infiltration galleries and minor pad grading, and a small dozer or skid steer for access maintenance and reclamation." DM at 4.

27.    "Drilling operations are expected to occur over less than one year from initiation, with work typically conducted on two 12-hour shifts (up to 24-hour operations if needed to meet schedule and subject to any timing restrictions).  The maximum potential surface disturbance for the updated plan comprises approximately .6 acres for drill pads, approximately 1.8 acres for

6

new temporary overland access routes (5,050 feet at 15 feet wide), and approximately 0.3 acre for laydown areas, for a combined estimate of less than 3 acres." DM at 4.

28.    "All disturbed areas will be reclaimed concurrently where practicable and immediately following completion of use at each site.  Operations will adhere to seasonal constraints and resource protection measures identified during the NEPA review and Section 7 consultation (e.g., restrictions near mapped bat hibernacula and potential bat maternity roost habitat), as well as Forest Service locatable minerals regulations (36 C.F.R. 228, Subpart A), the Black Hills National Forest Plan standards and guidelines, and applicable state and federal water quality and noxious weed management requirements." DM at 4.

29.    The DM states that: "All sites will be reclaimed following drilling activities. Project activities, including reclamation, will take one year or less." DM at 4.

30.    That is factually and legally erroneous.  This ignores the Project plan itself and what is actually approved in the DM.  The Project Plan of Operations (PoO), approved in the DM, acknowledges that reclamation will not be completed for at least 3 years, as ongoing monitoring, and potential "modifications to the site" would occur on a yearly basis. DM at 17.

31.    "PLS will commit to annual field inspections of drill sites and the lay-down area in conjunction with USFS and SD DANR staff (whenever possible) to cover areas used and occupied by PLS under this Plan of Operations to monitor for reclamation effectiveness and noxious weed infestations for 3 years." PoO at 14.  "Field inspection information will be compiled at the end of each field season and provided to the USFS." PoO at 14.

32.    "If the above reclamation efforts do not meet the established criteria required for bond release, PLS will collaborate with the USFS representative and make modifications to the site, incorporating such changes and additional procedures as may be expected to provide reclamation to the stated standard." PoO at 14.

33.    The DM further acknowledges that operations, including the required reclamation, will continue for at least 3 years:

> PLS will commit to annual field inspections of drill sites and the lay-down area in conjunction with Forest Service and SD DANR staff (whenever possible) to cover areas

used and occupied by PLS under this PO to monitor for reclamation effectiveness and noxious weed infestations for 3 years. Such field inspections will be documented with photographs or written descriptions. Field inspection information will be compiled at the end of each field season and provided to the Forest Service.

If the above reclamation efforts do not meet the established criteria required for bond release, PLS will collaborate with a Forest Service representative and **make modifications to the site, incorporating such changes and additional procedures as may be expected to provide reclamation to the stated standard**.

DM at 17 (emphasis added).

34.     In addition, the Forest Service will not release the required reclamation bond until PLS has demonstrated that these reclamation requirements and standards have been met – after the 3 year "monitoring" and site "modifications" have been completed.

35.     As the agency admitted: "Remaining reclamation bond will be held in order to monitor onsite and off-site damage to the environment and forest surface resources for three years to ensure proper revegetation and weed control." DM at 17.

36.     The PoO stated the same requirements:

Reclamation Bond Release

Release of the reclamation bonds for a specific drill site will be requested when:
1) Monitoring indicates that reclamation measures have effectively prevented or controlled onsite and off-site damage to the environment and forest surface resources for three years and such prevention is expected to continue.
2) Re-vegetation at reclaimed areas is adequate. Re-vegetation will be deemed adequate when:
a. Species composition is like that of adjacent areas; and
b. The vegetative crown cover is 60 to 75 percent of the existing percent vegetative crown cover of adjacent areas not disturbed by operations authorized by this Plan.

PoO at 14.

## THE PROJECT'S SIGNIFICANT IMPACTS TO PE'SLA AND PUBLIC LANDS

37.     The Project will result in significant harm to Pe'Sla and the public lands at and around the site, including the roads, drill sites, and support facilities.

38.     Pe'Sla includes a unique high mountain meadow and forests in the Black Hills and a sacred site to which Lakota people return ceremonially on an annual basis or other times of the year.

8

39.    Indeed, due to the outstanding cultural values, and ongoing religious uses of Pe'Sla, the Unites States, through the Department of Interior in 2014, has taken "approximately 2,022.66 acres of land known as the Pe'Sla Property (Pe'Sla, Property) in trust for the benefit of four Tribes (Tribes)," signifying its importance and value to Native American Tribes. Assistant Secretary - Indian Affairs, State of South Dakota v. Great Plains Regional Director Bureau of Indian Affairs, Pe'Sla Property (2,022.66 acres) Decision, December 2, 2016, at p. 1. Available at: https://turtletalk.blog/wp-content/uploads/2016/12/signed-decision-pe-sla.pdf (viewed March 12, 2026.

40.    "Specifically, the Property trust comprises an undivided 51.2 percent interest for the Rosebud Sioux Tribe, an undivided 29.9 percent interest for the Shakopee Mdewakanton Sioux Community, an undivided 12 percent interest for the Standing Rock Sioux Tribe, and an undivided 6.9 percent interest for the Crow Creek Sioux Tribe (collectively Tribes)." *Id*. at 1.

41.    The government affirmed this decision in a formal decision from the Assistant Secretary of Interior, Indian Affairs, in the December 2016 decision:

> The land is located within the historical territory of the Great Sioux Nation. The Tribes explain that Pe'Sla is "innately tied" to their creation and existence. Their application explains that Pe'Sla is one of their "most precious sacred sites . . . in the heart of everything that is, in the middle of the place where [they] originate from, and is central" to their existence. A study of the Property directed by Rosebud and performed by a group of Lakota, Dakota, and Nakota has identified 484 traditional cultural properties, 5 historic sites, 3 archeological sites, and 4 disturbed cultural sites within Pe'Sla.

*Id*. at 4.

42.    The Department rejected the State of South Dakota's challenge to the Interior Department's compliance with agency authorities in taking these lands into trust, but notably: "The State does not challenge the religious and cultural significance of Pe'Sla." *Id*. at 1.

43.    According to the company's PoO, Figure 1, primary access to the proposed drill site will be along Rochford Road and South Rochford Road.  The transport of industrial equipment along this primary access route will increase traffic, dust, noise, risk of wildfire, risk of hazardous materials spills, risk of wildlife impacts/fatalities and increased disruption of the cultural and ceremonial activities associated with the Pe'Sla site.

44.    In addition, as shown in the map provided by the USFS, a number of the mining claims and the proposed drilling locations are in close proximity to Pe'Sla.



45.   The Pe'Sla area, including both the prairie and the more forested lands nearby, are ecologically unique and include important surface water resources.  The area is underlain by the undifferentiated igneous and metamorphic rocks known as the Precambrian core or the crystalline core of the Black Hills.  The U.S. Geological Survey describes this area and its subsurface as the oldest rocks in the Black Hills, ranging from 1.7 to about 2.5 billion years old. Ground water is found in erratic, mostly unstudied fractures that may be contained or may be joined with water in other fractures.  This creates a very unpredictable drilling environment.

46.   The surface water in the area forms North Castle Creek and Castle Creek.  The latter is downstream from Deerfield Reservoir in this area.  These flow into upper Rapid Creek nearby, and then into Pactola Reservoir and on to Rapid City.  The area and the Reservoir provide municipal and drinking water for Rapid City, Ellsworth Air Force Base, and communities and reservation lands down the Cheyenne River to the Missouri River.  Rapid Creek provides all water supplies for Rapid City, which in turn supplies the water for the Air Force Base.  This water either directly flows at the surface into Rapid City's water plants, or it flows through the bottom of the creek underground into rock layers that become the aquifers from which Rapid City also draws water.

47.   Pe'Sla is a high-elevation grassland located in the heart of He Sapa (Black Hills). It is an important home to an ecologically significant landscape characterized by unique assemblages of native plant species, serving as a critical habitat refuge within an otherwise fragmented landscape.  The disturbance inherent in the proposed drilling at or immediately adjacent to this sensitive area poses serious and potentially permanent ecological risks.

48.   Grasslands are home to an abundance of life, including an incredible diversity of native grasses, wildflowers, pollinators, birds, mammals and other species adapted to the long-standing environmental and soil conditions of the area.  They provide critical ecosystem services such as water filtration, carbon sequestration, and habitat connectivity for wildlife.  Despite their ecological richness and vital functions, grasslands are highly vulnerable to human activity and have experienced severe global decline.

49.   Pe'Sla represents a remnant of a once more extensive high-elevation mixed-grass prairie grassland ecosystem. The habitat it represents, Black Hills Montane Grassland (BHMG),

11

sustains an endangered plant community endemic to the Black Hills of western South Dakota and northeastern Wyoming.  These rare types of prairie ecosystem depend on intact soil-plant relationships and minimal surface disruption.  Even small-scale human impacts can have long-lasting consequences.  This type of habitat is now rare in the Black Hills and is globally unique.  It is an ancestral lineage of grassland communities, now sparsely scattered as diminishing islands within a Ponderosa pine ocean.

**STATUTORY AND REGULATORY BACKGROUND:**
**THE NATIONAL ENVIRONMENTAL POLICY ACT**

50.    "The purposes of this Act [NEPA] are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. §4321.

51.    "In NEPA, Congress recognized the 'profound impact' of human activities, including 'resource exploration,' on the environment and declared a national policy 'to create and maintain conditions under which man and nature can exist in productive harmony.' 42 U.S.C. §4331(a)." *Center for Biological Diversity v. U.S. Dept. of the Interior*, 623 F.3d 633, 642 (9th Cir. 2010).  "Section 101 of NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 109 S.Ct. 1835, 1844 (1989).

52.    NEPA has "twin aims."  First, it requires federal agencies "to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its

12

decision-making process." *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002), *quoting Baltimore Gas & Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).

53.    NEPA mandates "all agencies of the Federal Government" to perform certain procedures. 42 U.S.C. §4332(2).

54.    For "major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i)      reasonably foreseeable environmental effects of the proposed agency action;
(ii)     any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
(iii)    a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
(iv)     the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
(v)      any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. §4332(2)(C).  The "detailed statement" is known as an "Environmental Impact Statement" or "EIS."

55.    The agencies must: "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document," 42 U.S.C. §4332(2)(D); make use of reliable data and resources in carrying out this Act, §4332(2)(E); and "study, develop, and describe technically and economically feasible alternatives." §4332(2)(F). "An agency shall issue an environmental impact statement with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment." §4336(b)(1).

56.    "An agency shall prepare an environmental assessment [EA] with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown." §4336(b)(2).

57. "If substantial questions are raised regarding whether the proposed action may have a significant effect upon the human environment, a decision not to prepare an EIS is unreasonable." *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

58. An EA is not required if "the agency finds that the proposed agency action is excluded pursuant to one of the agency's categorical exclusions." §4336(b)(2).

59. Under the Forest Service NEPA regulations for categorical exclusions, "A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if: (1) The proposed action is within one of the categories established by the Secretary at 7 C.F.R. part 1b.3; or (2) The proposed action is within a category listed in § 220.6(d) and (e)." 36 C.F.R. §220.6 Categorical exclusions.

60. In the DM, the agency utilized Category 220.6(e)(8), which is limited to "[s]hort-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities" as a type of action potentially appropriate for a categorical exclusion from further NEPA analysis. 36 C.F.R. §220.6(e)(8).

61. As stated in the agency's response to comments posting for the project: "On July 3, 2025, 36 Code of Federal Regulations (C.F.R.) 220 were finalized, rescinding the previous regulation and which modified the citations associated with certain categorical exclusions applicable to Forest Service actions.  Specifically, the reference formerly cited as 36 C.F.R. 220.6(e)(8) has been superseded and is now codified under 7 C.F.R. 1b.4(d)(32).  This change reflects the Department of Agriculture's consolidation of categorical exclusions and aligns Forest Service procedures with the broader USDA regulations governing environmental analysis and decision-making under the National Environmental Policy Act (NEPA)." Response to comments at 1.

62. Because the agency began its review of the project under the previous CE regulations and policies, they control the agency's review and govern this case. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 141 F.4th 976, 994 & n.5 (9th Cir. 2025) (applying 2019 NEPA regulations to NEPA process initiated before 2020 amendments).

14

63. The relied-upon CE for mineral exploration is the same under the current or previous rules. "Importantly, while the citation has changed, the intent and scope of the categorical exclusion remain the same." Response to comments at 1.

64. The USFS's categorical exclusion regulations require "scoping" prior to the use of a categorical exclusion. See 36 C.F.R. §220.6(c)(determination of potential for significant effects must be "based on scoping").

65. Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS (§ 220.6). 36 C.F.R. §220.4(e).

66. "Scoping is important to discover information that could point to the need for an EA or EIS versus a CE. Scoping is the means to identify the presence or absence of any extraordinary circumstances that would warrant further documentation in an EA or EIS. Scoping should also reveal any past, present, or reasonably foreseeable future actions with the potential to create uncertainty over the significance of cumulative effects." Forest Service NEPA Handbook (FSH), FSH §1909.15, Chapter 31.3.

67. Accordingly, only where the potential effects of a proposed action are certain to be insignificant, and scoping does not reveal otherwise or raise uncertainty, may USFS invoke a categorical exclusion. The determination of the significance of the potential effects requires USFS to consider the direct, indirect, and cumulative effects and impacts of past, present, and reasonably foreseeable future actions. *See* FSH 1909.15, Chapter 31.3.

68. In addition, where "extraordinary circumstances" are present and may be affected, an agency may not invoke a categorical exclusion and USFS should prepare an EA or EIS instead. 36 C.F.R. §220.6(a) and (b).

69. USFS has developed criteria specifying resource conditions that must be considered in determining whether "extraordinary circumstances" related to a proposed action make the use of a categorical exclusion inappropriate and whether the proposed action warrants further analysis in an EA or EIS. 36 C.F.R. §220.6(a) and (b); Forest Service Handbook §1909.15, Chapter 31.2.

15

70.    For this case, the critical "extraordinary circumstances" that must be considered by USFS before using a categorical exclusion include, but are not limited to, consideration of the impacts to "American Indians and Alaska Native religious or cultural sites." 36 C.F.R. §220.6(b)(1)(vi).  Similarly, the new CE rules states that "The resources to screen for in the potentially affected environment when considering extraordinary circumstances may include, but are not limited to: …. sites … of historic… significance, as designated by Federal, Tribal, State, or local governments, or property eligible for listing on the National Register of Historic Places." 7 C.F.R. §7.1b.3(f)(1)(vii).

71.    Pe'Sla is a site to which the "extraordinary circumstances" requirements apply.

**The Project Operations Will Not Be Completed Within the Required One Year, and Thus Do Not Qualify for the Asserted Categorcial Exclusion**

72.    To avoid full public and NEPA review, the agency relied upon CE-8 for "Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than 1 mile of low standard road, or use and minor repair of existing roads." 36 C.F.R. §220.6(e)(8) ("CE-8")(repromulgated in July 2025 at 7 C.F.R. §7.1.b.4(d)(32)).

73.    But based on the company's proposal, as approved by the agency, project operations will not be completed within the required one-year, and will take at least another three years to complete.

74.    Under USFS mineral regulations, the required reclamation of the impacts from the exploration are considered part of the mineral exploration "operations" proposed by PLS. 36 C.F.R. §228.3(a).  All aspects of the Project, including monitoring and reclamation, are considered part of the authorized "operations."  The regulations define "operations" as "[a]ll functions, work and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto." 36 C.F.R. §228.3.

75.    Under these regulations, the agency can only approve activities that can be reclaimed.  In detailing the reclamation requirements, the regulation specifically includes

16

rehabilitation/restoration of public lands as part of reclamation component of a mineral exploration plan:

> [O]perator shall, where practicable, reclaim the surface disturbed in operations by taking such measures as will prevent or control onsite and off-site damage to the environment and forest surface resources including:
> (1) Control of erosion and landslides;
> (2) Control of water runoff;
> (3) Isolation, removal or control of toxic materials;
> **(4) Reshaping and revegetation of disturbed areas**, where reasonably practicable; and
> (5) Rehabilitation of fisheries and wildlife habitat.

36 C.F.R. §228.8(g)(emphasis added).

76.    As detailed in the USFS's Anatomy of a Mine regulatory guidance report, reclamation is a critical and required component of a mineral exploration plan:

> Satisfactory reclamation should emphasize three major objectives:
> 1. The productivity of the reclaimed land should at least equal that of the premine surface. This does not necessarily mean that the site must be restored to an approximation of its original condition, or that surface uses after mining will be the same as those existing prior to mining. For example, an area used for marginal grazing prior to mining may be changed to a useful and attractive recreational complex, or perhaps in another case to a housing area.
> 2. Satisfactory reclamation should leave the mined area in a condition that will not contribute to environmental degradation either in the form of air- or water-borne materials, or from chemical pollution.
> 3. The reclaimed area should be esthetically acceptable and it should be safe for the uses intended.

"Anatomy of a Mine, From Prospect to Production," USDA Forest Service, General Technical Report INT-GTR-35, Revised February 1995, at 68-69.

https://www.fs.usda.gov/geology/includes/minerals/anatomy_mine.pdf (viewed March 12, 2026)

77.    PLS admits that the required reclamation will not be completed within the required one-year limit: "PLS will commit to annual field inspections of drill sites and the lay-down area in conjunction with USFS and SD DANR staff (whenever possible) to cover areas used and occupied by PLS under this Plan of Operations to monitor for reclamation effectiveness and noxious weed infestations for 3 years.  Such field inspections will be documented with photographs or written descriptions.  Field inspection information will be compiled at the end of each field season and provided to the USFS." PLS PoO at 14.

78. "If the above reclamation efforts do not meet the established criteria required for bond release, PLS will collaborate with the USFS representative and make modifications to the site, incorporating such changes and additional procedures as may be expected to provide reclamation to the stated standard." PoO at 14.

79. PLS further acknowledges that the required revegetation can only occur in the proper season, which could result in work done after the one-year limit. "Re-vegetation will be accomplished as soon as possible; however, will be performed in the proper season in accordance with accepted agricultural and reforestation practices identified in consultation with USFS personnel on a site-specific basis." PoO at 14.

80. The USFS Decision also admits that the required reclamation will not be completed within the one-year limit: "All areas of ground disturbance would be monitored for noxious weeds and **treated for two to three years post-disturbance** following Forest Service standards for treatment methods." DM at 11 (emphasis added).

81. In addition, under USFS mining regulations, PSL is required to submit a "reclamation cost estimate/financial assurance" (or bond). 36 C.F.R. §228.13.

82. PLS admits that it will not request release of the reclamation bond until three years of monitoring and reclamation is completed:

> Release of the reclamation bonds for a specific drill site will be requested when: Monitoring indicates that reclamation measures have effectively prevented or controlled onsite and off-site damage to the environment and forest surface resources for three years and such prevention is expected to continue.

PoO at 14.

83. Thus, whether or not drilling may finish in one year, Project operations "in connection with" and "reasonably incident" to the actual exploration (as defined in 36 C.F.R. §228.3(a)) will not be completed until up to three years or more after drilling is completed. As such, the Project operations, taken as a whole as mandated by the agency regulations, does not meet the "1 year or less" requirement of the CE utilized by the agency here.

84. This same USFS assertion in the DM was held illegal in *Defenders of Wildlife v. U.S. Forest Service*, Order, 4:14-cv-02446-RM (D. Ariz., 2015). On very similar facts, the

federal court held that since monitoring of reclamation success would last three years, and that reclamation based on that monitoring "may be required during the three-year monitoring period" – the situation here – the agency could not use the "short-term" mineral exploration category for a proposed mineral exploration project.

85.    "Defendants argue that this three-year monitoring period should not be considered part of the project's duration because all ground-disturbing project activities will be completed before the monitoring period begins; however, the Decision Memorandum anticipates that additional ground disturbing reclamation activities may be required during the three-year monitoring period.  USFS's determination that the project can be completed in one year or less is unsupported by the record." *Defenders*, Order at 8.

86.    Here, in an attempt to avoid the one-year limit, the DM asserts that "If project activities must extend beyond that time, additional environmental analysis would be necessary." DM at 4.

87.    Yet that attempt to fit the project under the one-year limit was squarely rejected by the court in *Defenders*.  "USFS argues that, if additional reclamation work is required during the three-year monitoring period, the additional reclamation work would be reviewed under NEPA.  However, the reclamation work is already contemplated in and authorized by the Decision Memorandum, with no indication in the record that the already-approved reclamation design features would require a new Plan of Operations or further review and approval." Order at 8, n.5.

88.    "Therefore, USFS's approval of the project using the categorical exclusion for short-term mineral explorations pursuant to 36 C.F.R. §220.6(e)(8) was arbitrary and capricious." Order at 8.

89.    Similarly, in a more recent case, in vacating the Forest Service's attempt to avoid the one-year limit in CE-8 by designating the post-drilling reclamation as a separate project, the Ninth Circuit confirmed that the post-drilling reclamation monitoring and potential work are part of project "operations," and must be counted in determining whether the project can be completed within the one-year limit in 36 C.F.R. §220.6(e)(8).

Forest Service's mineral regulations, which establish that **reclamation cannot be bifurcated from other mineral exploration efforts.** Specifically, the mineral regulations govern mineral exploration "operations." 36 C.F.R. pt. 228.3(a). Operations encompass "[a]ll functions, work, and activities in connection with" mineral exploration. § 228.3(a). This definition necessarily includes reclamation because mineral operations are required under § 228.8 to meet certain environmental protection procedures, including revegetation and wildlife habitat rehabilitation. § 228.8(g). In fact, operators must submit a "proposed plan of operations" to the Forest Service that describes "measures to be taken to meet the requirements for environmental protection in § 228.8," § 228.4(c)(3), and the Forest Service must then review the plan's environmental impact, §§ 228.4(a)(4), (b), 228.5(a)–(b). The Forest Service thus necessarily reviews mineral exploration and reclamation as a single proposed project.

*Friends of the Inyo v. U.S. Forest Service*, 103 F.4th 543, 552 (9th Cir. 2024)(emphasis added).

90.     Thus, because the mandated and required reclamation operations in this case – essentially the same as in *Defenders* and *Friends of the Inyo* – will last beyond one year, the project does not qualify for the relied-upon CE category and the agency's decisions violate NEPA and its implementing regulations.

**The Project's Significant Impacts to Pe'Sla Are an "Extraordinary Circumstance" Which Disqualifies the Application of a Categorical Exclusion**

91.     Where "extraordinary circumstances" are present and may be significantly affected, an agency may not invoke a categorical exclusion and USFS must prepare an EA or EIS instead. 36 C.F.R. §220.6(a) and (b)(previous CE rules); 7 C.F.R. §1b.3(f)(new CE rules).

92.     For this case, the critical "extraordinary circumstances" that must be considered by USFS before using a categorical exclusion include, but are not limited to, consideration of the impacts to "American Indians and Alaska Native religious or cultural sites." 36 C.F.R. §220.6(b)(1)(vi).  Similarly, the new CE rules states that "The resources to screen for in the potentially affected environment when considering extraordinary circumstances may include, but are not limited to …. sites … of historic… significance, as designated by Federal, Tribal, State, or local governments, or property eligible for listing on the National Register of Historic Places.". 7 C.F.R. §1b.3(f)(1)(vii).

93.     Despite the voluminous submittals by Plaintiffs, as well as numerous Tribal governments, detailing the significant impacts from the Project to Pe'Sla, the USFS based its CE

on its unsupported statement that "There are no known Native American or Alaska Native religious or cultural sites within the project area." DM at 20.

94.     As detailed above, this is wrong as a factual matter, as the project will adversely and significantly affect Pe'Sla, its uses by Plaintiffs, Tribal members, and the public.

95.     The agency's refusal to consider the impacts to Pe'Sla also contradicts the Forest Service's commitment to the Tribes to protect these lands, including a 2-mile wide radius of Pe-Sla.

96.     In a 2024 binding Memorandum of Understanding ("MOU") between the Forest Service and the various Tribes of the Great Sioux Nation, the agency committed to: "Co-stewardship of Black Hills National Forest lands, including lands within 2-mile radius of Flag Mountain and Pe'Sla Tribal Trust lands, see Appendix A map, and Black Elk Wilderness." MEMORANDUM OF UNDERSTANDING Between GREAT SIOUX NATION TRIBES: CHEYENNE RIVER SIOUX TRIBE, CROW CREEK SIOUX TRIBE, FLANDREAU SANTEE SIOUX TRIBE, LOWER BRULE SIOUX TRIBE, OGLALA SIOUX TRIBE, ROSEBUD SIOUX TRIBE, SANTEE SIOUX TRIBE OF NEBRASKA, SISSETON-WAHPETON OYATE, STANDING ROCK SIOUX TRIBE, SPIRIT LAKE SIOUX TRIBE, AND YANKTON SIOUX TRIBE
And The USDA, FOREST SERVICE ROCKY MOUNTAIN REGION
BLACK HILLS NATIONAL FOREST (MOU), at p. 6.

Appendix A

# Pe'Sla Boundary and Flag Mountain
*Black Hills National Forest in South Dakota*



97. The project is proposed within the 2-mile radius of Flag Mountain and Pe'Sla Tribal Trust lands identified in the aforementioned Memorandum of Understanding.

98. In any event, the test for whether there may be "extraordinary circumstances" is not limited to the actual project footprint, as USFS maintains. Rather, "When applying categorical exclusions, USDA subcomponents [USFS] **shall consider relevant resources in the potentially affected environment for which an extraordinary circumstance may exist** that would require the action to instead be documented in an environmental assessment (when there is uncertainty regarding the degree of effect) or an environmental impact statement (if it is determined there is a reasonably foreseeable significant impact)." 7 C.F.R. §1b.3(f)(emphasis added).

99. Here, in determining that there were no "extraordinary circumstances," the agency failed to analyze the project's impacts to the "potentially affected environment," which necessarily includes impacts to Pe'Sla and associated lands, resources, and uses.

100. The agency's failure to evaluate uses of Pe'Sla, and the impacts to Pe'Sla, occurred despite the commitment in the MOU, among other commitments, that "Forest Service Interdisciplinary Teams shall seek input from designated Tribal indigenous ecological knowledge holders and THPOs during analysis and planning processes for land management activities." MOU at 5, ¶ IV.E.

101. Further, the agency's self-imposed limit of its "extraordinary circumstances" analysis to just the "project area," and not the project's access routes/activities, ignores the agency's mining regulations which consider all access roads as part of the project "operations." 36 C.F.R. §228.3(a)(defining "operations" as "including roads and other means of access.").

102. Thus, USFS's failure to consider the impacts to Pe'Sla outside of the limited "project area" renders its Decision arbitrary and capricious and not in compliance with NEPA and its implementing regulations.

23

## CLAIMS FOR RELIEF

### First Claim For Relief
### (Violation of NEPA and APA)
### Improper Reliance on CE Category for "Short-term (1 year or less)"
### Mineral Exploration Operations

103.    Plaintiffs re-allege and incorporate the allegations in all preceding paragraphs by reference.

104.    In issuing the Decision and approving the exploration project, USFS inappropriately and illegally relied on a categorical exclusion applying to "short-term (1 year of less) mineral, energy, or geophysical investigations and their incidental support activities," 36 C.F.R. §220.6(e)(8); 7 C.F.R. §1b.4(d)(32), to exclude the exploration project from further NEPA review.  The Project's drilling, road construction, reclamation, monitoring and mitigation, and all incidental support activities will take more than one year to complete, rendering the use of the "short term" mineral exploration CE inapplicable.

105.    USFS's actions, including its decision not to prepare at least an EA is unsupported by the record and violates NEPA and its implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. §706.  USFS' violation of law prejudices and adversely affects Plaintiffs' rights and interests.

### Second Claim For Relief
### (Violation of NEPA and APA)
### The Project's Impacts to Pe'Sla Are an "Extraordinary Circumstance"
### Precluding Use of a Categorical Exclusion

106.    Plaintiffs re-allege and incorporate the allegations in all preceding paragraphs by reference.

107.    The Project's significant effects to Pe-Sla represent an "extraordinary circumstance," precluding the use of a CE for the Project.  The agency's decision is unsupported by the record and violates NEPA and its implementing regulations and policy and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by

law, within the meaning of the APA, 5 U.S.C. §706.  USFS' violation of law prejudices and adversely affects Plaintiffs' rights and interests.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that USFS violated the APA, NEPA, and their implementing regulations and policies in issuing its Decision Memo and Project approvals.

B.    Reverse, set aside, and vacate USFS's Decision Memo and authorization of the Project.

C.    Enjoin Defendants, their agents, servants, employees, and all others acting in concert with them, or subject to their authority or control, from proceeding with any aspect of the projects, pending full compliance with the requirements of law.

D.    Award Plaintiffs their reasonable attorney's fees and costs incurred in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412, or other provisions of law.

E.    Grant Plaintiffs such injunctive and additional relief as the Court deems just and equitable or as Plaintiffs may hereinafter request.

Respectfully submitted this 1st day of April 2026,

/s/ Tracey Zephier

Tracey Zephier (SD Bar #3058)
408 Knollwood Drive
Rapid City, SD  57701
(605) 791-3999
tracey@ndncollective.org

Bruce Ellison (SD Bar # 462)
P.O. Box 2508
Rapid City, SD 57709
(605) 858-1850
Bruce.Ellison4@gmail.com

Roger Flynn (CO Bar #21078) *Pro Hac Vice Application To Be Filed*
Jeffrey C. Parsons (CO Bar #30210) *Pro Hac Vice Application To Be Filed*

25

WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org

*Attorneys for Plaintiffs*

JS 44  (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

NDN Collective; Black Hills Clean Water Alliance; Earthworks

**(b)** County of Residence of First Listed Plaintiff    Pennington
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Tracey Zephier (SD Bar #3058), 408 Knollwood Drive Rapid City, SD  57701, (605) 791-3999

## DEFENDANTS

U.S. Forest Service; U.S. Department of Agriculture; James Gubbels, District Ranger

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☒ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**　**PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane　☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product　Product Liability | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability　☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &　Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| & Enforcement of Judgment | Slander　Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'　Product Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted | Liability　☐ 368 Asbestos Personal | | New Drug Application | ☐ 470 Racketeer Influenced and |
| Student Loans | ☐ 340 Marine　Injury Product | | ☐ 840 Trademark | Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product　Liability | | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment | Liability　**PERSONAL PROPERTY** | **LABOR** | Act of 2016 | (15 USC 1681 or 1692) |
| of Veteran's Benefits | ☐ 350 Motor Vehicle　☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle　☐ 371 Truth in Lending | Act | **SOCIAL SECURITY** | Protection Act |
| ☐ 190 Other Contract | Product Liability　☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal　Property Damage | Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury　☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | ☐ 362 Personal Injury -　Product Liability | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | Leave Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**　**PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights　**Habeas Corpus:** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting　☐ 463 Alien Detainee | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment　☐ 510 Motions to Vacate | | or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/　Sentence | | ☐ 871 IRS—Third Party | ☒ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations　☐ 530 General | | 26 USC 7609 | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -　☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment　**Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities -　☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other　☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education　☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
National Environmental Policy Act, 42 USC 4321, et seq; Administrative Procedure Act, 5 USC 701, et seq.

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____