Tracey Zephier (SD Bar #3058)
408 Knollwood Drive
Rapid City, SD  57701
(605) 791-3999
tracey@ndncollective.org

Bruce Ellison (SD Bar # 462)
P.O. Box 2508
Rapid City, SD 57709
(605) 858-1850
Bruce.Ellison4@gmail.com

Roger Flynn (CO Bar #21078) *Pro Hac Vice*
Jeffrey C. Parsons (CO Bar #30210) *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| NDN COLLECTIVE; BLACK HILLS CLEAN WATER ALLIANCE; EARTHWORKS,    ) | Case No.: 5:26-cv-05035-CCT |
|        ) | |
|       Plaintiffs,    ) | **PLAINTIFFS' MEMORANDUM** |
|        **)** | **IN SUPPORT of MOTION FOR** |
|        ) | **TEMPORARY RESTRAINING** |
| v.      ) | **ORDER AND PRELIMINARY** |
|        ) | **INJUNCTION** |
| UNITED STATES FOREST SERVICE;  ) | |
| U.S. DEPARTMENT OF AGRICULTURE;  ) | |
| JAMES GUBBELS, District Ranger,  ) | |
|        ) | |
|       Defendants.  ) | |

i

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..............................................................................................iii

**EXHIBIT LIST** ...................................................................................................... vi

**TABLE OF ACRONYMS** ........................................................................................ vi

**INTRODUCTION** ....................................................................................................1

**STANDARDS FOR PRELIMINARY RELIEF** ..........................................................3

**THE ROCHFORD EXPLORATION PROJECT** ........................................................3

**THE PROJECT'S SIGNIFICANT and IRREPARABLE IMPACTS TO PE'SLA AND PUBLIC LANDS** ......6

**PLAINTIFFS SATISFY THE INJUNCTION STANDARDS** ......................................11

**I.      Plaintiffs Are Likely to Succeed on the Merits**..................................11

A.      *Statutory and Regulatory Background: NEPA and Categorical Exclusions.* ................11

B.      *The Project Operations, Which Include the Required Reclamation, Will Not Be Completed Within One Year, and Thus Do Not Qualify for the Asserted Categorical Exclusion* ..................................................................15

      1.      Forest Service Mining Regulations Consider Multi-year Reclamation as an Integral and Necessary Part of Exploration Operations. ..................................15

      2.      The Agency and Project Applicant Acknowledge That Project Operations Will Not Be Completed Within a Year. ..........................................17

      3.      Federal Courts Have Rejected the Same Forest Service Rational Relied Upon Here.........................................................................18

C.      *The Project's Significant Impacts to Pe'Sla Are an "Extraordinary Circumstance" Which Disqualifies the Use of a Categorical Exclusion.* ..................................20

**II.     Injunctive Relief is Needed to Prevent Irreparable Harm**..........................................22

**III.    The Balance of Equities and Public Interest Support an Injunction** ........................27

**IV.     The Court Should Impose No Bond or Only a Nominal Bond** ..............................28

**CONCLUSION** ...................................................................................................29

## TABLE OF AUTHORITIES

*Federal Caselaw*

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................................28

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987) ...................................................................................................23

*Baltimore Gas & Electric Co. v. Natural Res. Def. Council*,
462 U.S. 87 (1983) .....................................................................................................12

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) ....................................................................................13

*Center for Biological Diversity v. U.S. Dept. of the Interior*,
623 F.3d 633 (9th Cir. 2010) .....................................................................................12

*DataPhase Systems v. CL Systems*,
640 F.2d 109 (8th Cir. 1981) .......................................................................................3

*Davis v. Mineta*,
302 F.3d 1104 (10th Cir. 2002) .................................................................................28

*Defenders of Wildlife v. U.S. Forest Service*
4:14-cv-02446-RM (D. Ariz., 2015) ......................................................................2, 19

*Friends of the Inyo v. U.S. Forest Service*,
103 F.4th 543 (9th Cir. 2024) .................................................................................2, 20

*Home Instead, Inc. v. Florance*,
721 F.3d 494 (8th Cir. 2013) .....................................................................................11

*Hualapai Indian Tribe v. Haaland*,
No. CV-24-08154-PCT-DJH, 2024 WL 4678059 (D. Az, Nov. 5, 2024) ..............................29

*Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Department of Revenue*
781 F.Supp.3d 724 (S.D. Iowa 2025) ........................................................................23

*Jones v. SEC*,
298 U.S. 1 (1936) .......................................................................................................28

*Kern v. BLM*,
284 F.3d 1062 (9th Cir. 2002) ...................................................................................12

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................................................27

*Porter v. Lee*,
328 U.S. 246 (1946) ................................................................................................28

*Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers,*
826 F.3d 1030 (8th Cir. 2016). ........................................................................27, 28

*Robertson v. Methow Valley Citizens Council*,
109 S.Ct. 1835 (1989) ............................................................................................12

*Schmitt v. Rebertus*,
148 F.4th 958 (8th Cir. 2025) ..............................................................................3, 11

*Sierra Club v. U.S. Army Corps of Engineers*,
645 F.3d 978 (8th Cir. 2011) ...........................................................................27, 28

*Sleep Number Corp. v. Young*,
33 F.4th 1012 (8th Cir. 2022) ................................................................................11

*S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) ..................................................................................28

*Tincher v. Noem,*
No. 0:25-cv-4669 (KMM/DTS), 2026 WL 125375 (D. Minn, Jan. 16, 2026) ......................29

*Winter v. Natural Resources Defense Council*,
555 U.S. 7 (2008) ...............................................................................................3, 23

**Federal Statutes**

Fed. Rule. Civ. Pro. 65 .......................................................................................1, 28

National Environmental Policy Act ("NEPA"),
42 U.S.C. §§ 4321 *et seq.* ....................................................................... *passim*

NEPA, 42 U.S.C. §4321 ..........................................................................................12

NEPA, 42 U.S.C. §4331(a). .....................................................................................12

NEPA, 42 U.S.C. §4332(2). .....................................................................................12

NEPA, 42 U.S.C. §4336(b) ......................................................................................13

iv

*Federal Regulations*

7 C.F.R. §7.1.b ...........................................................................2, 13, 14, 15, 20, 21

36 C.F.R. Part 228A.........................................................................................4

36 C.F.R. §228.3 ...............................................................................16, 18, 19

36 C.F.R. §220.4 ....................................................................................14, 20

36. C.F.R. §228.5 ...................................................................................... 20

36 C.F.R. §220.6(e)(8)("CE-8") ......................................................2, 13, 14, 15, 19

36 C.F.R. §220.6 ............................................................................................14

36 C.F.R. §220.6(a) and (b) ........................................................................15, 20

36 C.F.R. §220.6(c) .........................................................................................14

36 C.F.R. §228.8 ...............................................................................16, 19, 20

36 C.F.R. §228.13 ...........................................................................................18

*Other Authorities*

Decision, Assistant Secretary - Indian Affairs, State of South Dakota v. Great Plains Regional Director Bureau of Indian Affairs, Pe'Sla Property (2,022.66 acres), December 2, 2016. ...................................................................................................6, 7

Forest Service NEPA Handbook (FSH), FSH §1909.15, Chapter 31.3. ..........................14, 15

**EXHIBIT LIST**

Exhibit 1    *Defenders of Wildlife v. U.S. Forest Service*, Order, 4:14-cv-02446-RM (D. Ariz., 2015)

Exhibit 2    Rochford Exploration Project Plan of Operations (PoO)

Exhibit 3    Forest Service Decision Memo, February 27, 2026

Exhibit 4    MEMORANDUM OF UNDERSTANDING Between GREAT SIOUX NATION TRIBES … And The USDA, FOREST SERVICE ROCKY MOUNTAIN REGION BLACK HILLS NATIONAL FOREST (MOU), 2024

Exhibit 5    Declaration of Nick Tilsen (CEO and Founder, NDN Collective)

Exhibit 6    Valeriah Big Eagle (Director of He Sapa Initiatives, NDN Collective)

Exhibit 7    Wizipan Garriott (President, NDN Collective)

Exhibit 8    Dr. Lilias Jarding (Executive Director, Black Hills Clean Water Alliance

Exhibit 9    Declaration of Aaron Mintzes (Earthworks)

**TABLE OF ACRONYMS**

CE      Categorical Exclusion under Forest Service NEPA regulations

DM      Forest Service Decision Memo, February 27, 2026

MOU     MEMORANDUM OF UNDERSTANDING Between GREAT SIOUX NATION TRIBES … And The USDA, FOREST SERVICE ROCKY MOUNTAIN REGION BLACK HILLS NATIONAL FOREST

NEPA    National Environmental Policy Act, 42 U.S.C. §§4321 *et seq.*

PoO     Rochford Exploration Project Plan of Operations (PoO)

vi

**<u>INTRODUCTION</u>**

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs NDN Collective (NDN), Black Hills Clean Water Alliance (BHCWA), and Earthworks, request a temporary restraining order and preliminary injunction to prevent irreparable harm resulting from the Forest Service's approval of the Rochford Exploration Drilling Project (Project or project), a large mineral exploration drilling project on federal public lands in the Black Hills that will directly affect Pe'Sla, a recognized Native American sacred site and place of ceremony. Pe'Sla is sacred to the Lakota and many of Plaintiffs' members, who have visited the site for countless generations for prayer, ceremony, and cultural activities. Pe'Sla is recognized as an Indigenous sacred site by various Tribes, the federal government (including the Defendant Forest Service), State of South Dakota, and Pennington County.

Injury to Plaintiffs and the Pe'Sla landscape is imminent. Without any notice by the Forest Service to the public or affected Tribes, Plaintiffs have just recently become aware that the company has already commenced initial drilling and road construction. These industrial operations irreparably harm Plaintiffs' members' use of the Pe'Sla landscape and public lands impacted by the project's drilling, road construction and industrial activities. This is especially urgent, for as shown in the Declarations, **sacred religious ceremonies in the Pe'Sla area will begin on May 2, which will be directly affected by project operations.**

Despite the overwhelming evidence submitted to the agency by Plaintiffs and numerous Native American Tribes that the Project would directly and significantly affect the Pe'Sla cultural landscape, and vital water and other important public resources resulting from the drilling project, the Defendant U.S. Forest Service (USFS) "categorically excluded" the Project from the environmental, public, and cultural resources review required by the National Environmental Policy Act, 42 U.S.C. §§4321 *et seq*. (NEPA), issuing a cursory "Categorical Exclusion" (CE), which severely limited public and agency review of the Project. By relying on a CE where "extraordinary circumstances"—significant impacts to recognized Native American sacred sites—were present, the USFS violated NEPA.

The agency also violated NEPA by relying on a CE that on its face does not apply to this Project. The CE the agency relied upon is for

> Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than 1 mile of low standard road, or use and minor repair of existing roads.

36 C.F.R. §220.6(e)(8)("CE-8")(repromulgated in July 2025 at 7 C.F.R. §7.1.b.4(d)(32)). Yet the approved mineral operations, by the company's and the agency's own statements and admissions, will last more than one year, as the required reclamation of the exploration impacts will last up to three years, if not longer, after completion of the initial drilling activities.

The agency's use of CE-8 directly contradicts on-point federal court decisions rejecting the same USFS rationale used here. *See Defenders of Wildlife v. U.S. Forest Service*, Order, 4:14-cv-02446-RM (D. Ariz., 2015)(Exhibit 1). On essentially the same facts, the federal court held that since monitoring of reclamation success would last three years, and that reclamation based on that monitoring "may be required during the three-year monitoring period" – the situation here – the agency could not use the CE-8 "short-term" mineral exploration category for a proposed mineral exploration project.

The Ninth Circuit recently held the same, vacating the Forest Service's attempt to avoid the one-year limit in CE-8 by designating the post-drilling reclamation as a separate project. The Circuit confirmed that the reclamation monitoring and potential work are part of project "operations," and must be counted in determining whether the project can be completed within the one-year limit in 36 C.F.R. §220.6(e)(8). "Forest Service's mineral regulations, [] establish that reclamation cannot be bifurcated from other mineral exploration efforts." *Friends of the Inyo v. U.S. Forest Service*, 103 F.4th 543, 552 (9th Cir. 2024).

Plaintiffs' counsel notified counsel for the Federal Defendants of this Motion on April 24, 2026, via email to the U.S. Attorney's Office for the South Dakota District. Counsel for the Defendants has not responded.

## STANDARDS FOR PRELIMINARY RELIEF

To obtain preliminary relief, a Plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008).  In deciding whether to grant preliminary injunctive relief, courts consider:

> (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties' litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Schmitt v. Rebertus*, 148 F.4th 958, 966 (8th Cir. 2025)(citing *DataPhase Systems v. CL Systems*, 640 F.2d 109 (8th Cir. 1981)).

Plaintiffs satisfy all parts of this test, and an injunction against the Project should issue.

## THE ROCHFORD EXPLORATION PROJECT

On June 11, 2024, the USFS received a proposed Plan of Operations (PoO) for the Project —a proposal to conduct extensive drilling, road building, reclamation, and other operations on public lands in the Black Hills near Rochford, South Dakota (Exhibit 2). After internal review, the USFS issued a short "scoping notification letter" on April 9, 2025, to a limited set of "interested parties" (and posting on its website). Despite such brief public notice, 2,226 scoping comments were received on the project.

With no further opportunity for public review, the agency issued the challenged Decision Memo on February 27, 2026, approving the Project (DM)(Exhibit 3). As approved by the DM, the project will result in:

> [d]rilling boreholes at up to 18 proposed sites on NFS lands. Each drill site would be approximately 30 feet x 50 feet, or 0.034 acre in size. There would be one borehole at each site. … The maximum depth of each borehole would be 1,000.

DM at 3. "Additionally, there would be two 0.15-acre laydown/staging areas used to store core boxes, hose, spare parts, water storage tanks, and site portable sanitation facilities." DM at 3. Other details in the DM show the large scale disruptive extent of this project:

3

> Access to drill sites would rely on existing National Forest System roads (NFS) or temporary access routes and overland two-track routes wherever feasible, specifically NFS roads 190 and 125 for northern sites and NFS road 132 for southern sites. To reach pads from those roads, the proponent would implement approximately 5,050 feet of temporary overland access route improvements.

DM at 3.

> Drilling would be supplied with water from an approved municipal or industrial source trucked to the site. Water would be recirculated during drilling through either in-ground infiltration galleries (excavated trenches typically 2–4 feet deep, approximately 24 inches wide, up to 20 feet long) or above-ground sump systems (double-tank or double-crib systems lined with oil-impermeable fabric), which allow cuttings and fines to settle and clarified water to be returned to the drill.

DM at 3.

> Project equipment will include one to three track or trailer mounted drill rigs; a water truck; pickup support vehicles; all terrain/utility vehicles; and, on an as needed basis, a compact track loader or backhoe for infiltration galleries and minor pad grading, and a small dozer or skid steer for access maintenance and reclamation.

DM at 4.

> Drilling operations are expected to occur over less than one year from initiation, with work typically conducted on two 12-hour shifts (up to 24-hour operations if needed to meet schedule and subject to any timing restrictions). The maximum potential surface disturbance for the updated plan comprises approximately .6 acres for drill pads, approximately 1.8 acres for new temporary overland access routes (5,050 feet at 15 feet wide), and approximately 0.3 acre for laydown areas, for a combined estimate of less than 3 acres.

DM at 4.

> The approved project includes the required post-drilling reclamation of the lands:

> All disturbed areas will be reclaimed concurrently where practicable and immediately following completion of use at each site. Operations will adhere to seasonal constraints and resource protection measures identified during the NEPA review and Section 7 consultation (e.g., restrictions near mapped bat hibernacula and potential bat maternity roost habitat), as well as Forest Service locatable minerals regulations (36 C.F.R. 228, Subpart A), the Black Hills National Forest Plan standards and guidelines, and applicable state and federal water quality and noxious weed management requirements.

DM at 4.

The DM states that: "All sites will be reclaimed following drilling activities. Project activities, including reclamation, will take one year or less." DM at 4. **That is factually and legally erroneous**, as it contradicts the Project plan and what is actually approved in the DM. The Project Plan of Operations (PoO), approved in the DM, acknowledges that reclamation will not be completed for at least 3 years, as ongoing monitoring, and potential "modifications to the site" would occur on a yearly basis. DM at 17. (PoO attached as Exhibit 2).

Other statements in the PoO affirm the length of the project:

> PLS will commit to annual field inspections of drill sites and the lay-down area in conjunction with USFS and SD DANR staff (whenever possible) to cover areas used and occupied by PLS under this Plan of Operations to monitor for reclamation effectiveness and noxious weed infestations for 3 years.

PoO at 14. "Field inspection information will be compiled at the end of each field season and provided to the USFS." PoO at 14. The PoO continues:

> If the above reclamation efforts do not meet the established criteria required for bond release, PLS will collaborate with the USFS representative **and make modifications to the site**, incorporating such changes and additional procedures as may be expected to provide reclamation to the stated standard.

PoO at 14 (emphasis added).

The DM further acknowledges that operations, including the required reclamation, will continue for at least 3 years:

> PLS will commit to annual field inspections of drill sites and the lay-down area in conjunction with Forest Service and SD DANR staff (whenever possible) to cover areas used and occupied by PLS under this PO to monitor for reclamation effectiveness and noxious weed infestations for 3 years. Such field inspections will be documented with photographs or written descriptions. Field inspection information will be compiled at the end of each field season and provided to the Forest Service.
>
> If the above reclamation efforts do not meet the established criteria required for bond release, **PLS will collaborate with a Forest Service representative and make modifications to the site**, **incorporating such changes and additional procedures as may be expected to provide reclamation to the stated standard**.

DM at 17 (emphasis added).

In addition, the Forest Service will not release the required reclamation bond until PLS has demonstrated that these reclamation requirements and standards have been met – **after** the 3 year "monitoring" and site "modifications" have been completed. As the agency admitted: "Remaining reclamation bond will be held in order to monitor onsite and off-site damage to the environment and forest surface resources for three years to ensure proper revegetation and weed control." DM at 17. The PoO stated the same requirements:

Reclamation Bond Release

Release of the reclamation bonds for a specific drill site will be requested when:
1)    Monitoring indicates that reclamation measures have effectively prevented or controlled onsite and off-site damage to the environment and forest surface resources for three years and such prevention is expected to continue.
2)    Re-vegetation at reclaimed areas is adequate. Re-vegetation will be deemed adequate when:
a.    Species composition is like that of adjacent areas; and
b.    The vegetative crown cover is 60 to 75 percent of the existing percent vegetative crown cover of adjacent areas not disturbed by operations authorized by this Plan.

PoO at 14.

## THE PROJECT'S SIGNIFICANT and IRREPARABLE HARM TO PE'SLA AND PUBLIC LANDS

The Project will result in significant and irreparable harm to Pe'Sla and its surrounding cultural landscape, including the public lands at and around the site, including the roads, drill sites, and support facilities. Pe'Sla includes a unique high mountain meadow and forests located in the heart of He Sapa (Black Hills), and is sacred to Lakota people, including Plaintiffs' members, who return ceremonially on an annual basis or other times of the year.

Indeed, due to the outstanding cultural values, and ongoing religious and cultural uses of Pe'Sla, the United States, through the Department of the Interior in 2014, dedicated "approximately 2,022.66 acres of land known as the Pe'Sla Property (Pe'Sla, Property) in trust for the benefit of four Tribes (Tribes)," signifying its importance and value to Native American Tribes. Decision, Assistant Secretary - Indian Affairs, State of South Dakota v. Great Plains Regional Director Bureau of Indian Affairs, Pe'Sla Property (2,022.66 acres), December 2, 2016,

6

at p. 1. Available at: https://turtletalk.blog/wp-content/uploads/2016/12/signed-decision-pe-sla.pdf (viewed April 24, 2026).

"Specifically, the Property trust comprises an undivided 51.2 percent interest for the Rosebud Sioux Tribe, an undivided 29.9 percent interest for the Shakopee Mdewakanton Sioux Community, an undivided 12 percent interest for the Standing Rock Sioux Tribe, and an undivided 6.9 percent interest for the Crow Creek Sioux Tribe (collectively Tribes)." *Id*. at 1.

The Interior Department recognized the immense importance of Pe'Sla and the surrounding lands:

> The land is located within the historical territory of the Great Sioux Nation. The Tribes explain that **Pe'Sla is "innately tied" to their creation and existence. Their application explains that Pe'Sla is one of their "most precious sacred sites . . . in the heart of everything that is, in the middle of the place where [they] originate from, and is central" to their existence**.

*Id*. at 4 (emphasis added). "A study of the Property directed by Rosebud and performed by a group of Lakota, Dakota, and Nakota has identified 484 traditional cultural properties, 5 historic sites, 3 archeological sites, and 4 disturbed cultural sites within Pe'Sla." *Id*.

The Interior Department rejected the State of South Dakota's challenge to the Interior Department's compliance with agency authorities in taking these lands into trust, but notably: "The State does not challenge the religious and cultural significance of Pe'Sla." *Id*. at 1.

The project's drilling, road construction, and other industrial operations will occur within the Pe'Sla area, and just north and northeast of the protected Pe'Sla lands. According to the company's PoO, Figure 1, primary access to the proposed drill site will be along Rochford Road and South Rochford Road. The transport of industrial equipment along this primary access route will increase traffic, dust, noise, risk of wildfire, risk of hazardous materials spills, risk of wildlife impacts/fatalities and increased disruption of the cultural and ceremonial activities associated with the Pe'Sla site. These roads are used by Lakota peoples, and Plaintiffs' members, to access the Pe'Sla. In addition, as shown, the company's mining claims and the approved drilling locations

are in close proximity to the specifically-protected Pe'Sla lands.



But the critical importance of Pe'Sla is **not** limited to just the specific acreage designated and taken into trust by the Interior Department. It is the heart of a larger Lakota cultural landscape recognized by the federal government, including the Defendant Forest Service. As detailed below, in approving the project, the agency refused to consider the impacts not only to the cultural and religious uses of the specific 2,022 acres, but also to the lands surrounding these lands – contradicting the Forest Service's commitment to the Tribes to protect these lands, including a 2-

8

mile wide radius of the specific Pe'Sla acres.

In a 2024 binding Memorandum of Understanding ("MOU") between the Forest Service and the various Tribes of the Great Sioux Nation, the agency committed to: "Co-stewardship of Black Hills National Forest lands, including lands within 2-mile radius of Flag Mountain and Pe'Sla Tribal Trust lands, see Appendix A map, and Black Elk Wilderness." MEMORANDUM OF UNDERSTANDING Between GREAT SIOUX NATION TRIBES … And The USDA, FOREST SERVICE ROCKY MOUNTAIN REGION BLACK HILLS NATIONAL FOREST (MOU), at p. 6 (Exhibit 4).  As shown below in the map contained in the MOU, the project's drilling, road construction and other industrial operations would occur within the 2-mile radius of Flag Mountain and Pe'Sla Tribal Trust lands identified in the Forest Service-Tribal MOU.



9

This larger Pe'Sla landscape includes both the prairie grassland and the more forested lands nearby. In addition to the critical cultural and religious significance and uses, these lands are ecologically unique and include important surface water resources. It is an important home to an ecologically significant landscape characterized by unique assemblages of native plant species, serving as a critical habitat refuge within an otherwise fragmented landscape. The disturbance inherent in the proposed drilling at or immediately adjacent to this sensitive area poses serious and potentially permanent ecological risks.

The area is underlain by the undifferentiated igneous and metamorphic rocks known as the Precambrian core or the crystalline core of the Black Hills. The U.S. Geological Survey describes this area and its subsurface as the oldest rocks in the Black Hills, ranging from 1.7 to about 2.5 billion years old. Ground water is found in erratic, mostly unstudied fractures that may be contained or may be joined with water in other fractures. This creates a very unpredictable drilling environment.

The surface water in the area forms North Castle Creek and Castle Creek. The latter is downstream from Deerfield Reservoir in this area. These flow into upper Rapid Creek nearby, and then into Pactola Reservoir and on to Rapid City. The area and the Reservoir provide municipal and drinking water for Rapid City, Ellsworth Air Force Base, and communities and reservation lands down the Cheyenne River to the Missouri River. This water either directly flows at the surface into Rapid City's water plants, or it flows through the bottom of the creek underground into rock layers that become the aquifers from which Rapid City also draws water.

This unique mountain grassland is home to an abundance of life, including an incredible diversity of native grasses, wildflowers, pollinators, birds, mammals and other species adapted to the long-standing environmental and soil conditions of the area. They provide critical ecosystem services such as water filtration, carbon sequestration, and habitat connectivity for wildlife. Despite their ecological richness and vital functions, grasslands are highly vulnerable to human activity and have experienced severe global decline.

Pe'Sla represents a remnant of a once more extensive high-elevation mixed-grass prairie grassland ecosystem. The habitat it represents, Black Hills Montane Grassland (BHMG), sustains an endangered plant community endemic to the Black Hills of western South Dakota and northeastern Wyoming. These rare types of prairie ecosystem depend on intact soil-plant relationships and minimal surface disruption. Even small-scale human impacts can have long-lasting consequences. This type of habitat is now rare in the Black Hills and is globally unique. It is an ancestral lineage of grassland communities, now sparsely scattered as diminishing islands within a Ponderosa pine ocean.

### PLAINTIFFS SATISFY THE INJUNCTION REQUIREMENTS

**I.       Plaintiffs Are Likely To Succeed on the Merits.**

The likelihood of success factor examines whether plaintiffs can "demonstrate that [they have] a 'fair chance' of prevailing on the merits." *Schmitt v. Rebertus*, 148 F.4th 958, 966 (8th Cir. 2025), quoting *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). "While no single factor is determinative, the probability of success factor is the most significant." *Schmitt* at 966, quoting *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). "To show a fair chance of prevailing, [Schmitt] must show that [his] claims provide fair ground for litigation, but [he] need not show that [he] has a greater than fifty per cent likelihood of success." *Schmitt*, at 966, quoting *Sleep Number*, at 1016–17.

Plaintiffs have shown that, at a minimum, that they "have a fair chance of prevailing" on the merits, **especially since the Forest Service's use of CE-8 for similar exploration projects has been repeatedly rejected by the federal courts considering the very same issue and agency explanation**.

*A.       Statutory and Regulatory Background: NEPA and Categorical Exclusions.*

"The purposes of this Act [NEPA] are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and

11

welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. §4321.

"NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 109 S.Ct. 1835, 1844 (1989). "In NEPA, Congress recognized the 'profound impact' of human activities, including 'resource exploration,' on the environment and declared a national policy 'to create and maintain conditions under which man and nature can exist in productive harmony.' 42 U.S.C. §4331(a)." *Center for Biological Diversity v. U.S. Dept. of the Interior*, 623 F.3d 633, 642 (9th Cir. 2010). NEPA has "twin aims." First, it requires federal agencies "to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." *Kern v. BLM*, 284 F.3d 1062, 1066 (9th Cir. 2002), quoting *Baltimore Gas & Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983).

NEPA mandates "all agencies of the Federal Government" to perform certain procedures. 42 U.S.C. §4332(2). For "major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i)     reasonably foreseeable environmental effects of the proposed agency action;

(ii)    any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii)   a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

(iv)    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v)     any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. §4332(2)(C). This "detailed statement" is known as an "Environmental Impact Statement" or "EIS."

"An agency shall prepare an environmental assessment [EA] with respect to a proposed

12

agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown." §4336(b)(2). An EA is not required if "the agency finds that the proposed agency action is excluded pursuant to one of the agency's categorical exclusions." §4336(b)(2). Under the Forest Service NEPA regulations for categorical exclusions,

> A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if: (1) The proposed action is within one of the categories established by the Secretary at 7 C.F.R. part 1b.3; or (2) The proposed action is within a category listed in § 220.6(d) and (e).

36 C.F.R. §220.6 Categorical exclusions.

For all levels of NEPA review, the agencies must: "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document," 42 U.S.C. §4332(2)(D); make use of reliable data and resources in carrying out this Act, §4332(2)(E); and "study, develop, and describe technically and economically feasible alternatives." §4332(2)(F). "An agency shall issue an environmental impact statement with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment." §4336(b)(1).

In the challenged DM, the agency utilized CE Category 220.6(e)(8), (CE-8), which is limited to "[s]hort-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities" as a type of action potentially appropriate for a categorical exclusion from further NEPA analysis. 36 C.F.R. §220.6(e)(8). Because the agency began its review of the project under the previous CE regulations and policies, they control the agency's review and govern this case. *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 141 F.4th 976, 994 & n.5 (9th Cir. 2025)(applying 2019 NEPA regulations to NEPA process initiated before 2020 amendments).

Although the agency recently re-organized its NEPA and CE regulations, the relied-upon CE for mineral exploration is the same under the current or previous rules. "Importantly, while

the citation has changed, the intent and scope of the categorical exclusion remain the same."

USFS Response to comments at 1.

https://www.fs.usda.gov/r02/blackhills/projects/archive/67838 (viewed April 25, 2026). As stated in the agency's response to comments posting for the project:

> On July 3, 2025, 36 Code of Federal Regulations (C.F.R.) 220 were finalized, rescinding the previous regulation and which modified the citations associated with certain categorical exclusions applicable to Forest Service actions. Specifically, the reference formerly cited as 36 C.F.R. 220.6(e)(8) has been superseded and is now codified under 7 C.F.R. 1b.4(d)(32). This change reflects the Department of Agriculture's consolidation of categorical exclusions and aligns Forest Service procedures with the broader USDA regulations governing environmental analysis and decision-making under the National Environmental Policy Act (NEPA).

Response to comments at 1.

The USFS's categorical exclusion regulations require "scoping" prior to the use of a categorical exclusion. *See* 36 C.F.R. §220.6(c)(determination of potential for significant effects must be "based on scoping"). *See also* 36 C.F.R. §220.4(e).

> Scoping is important to discover information that could point to the need for an EA or EIS versus a CE. Scoping is the means to identify the presence or absence of any extraordinary circumstances that would warrant further documentation in an EA or EIS. Scoping should also reveal any past, present, or reasonably foreseeable future actions with the potential to create uncertainty over the significance of cumulative effects.

Forest Service NEPA Handbook (FSH), FSH §1909.15, Chapter 31.3.

https://www.fs.usda.gov/emc/nepa/includes/wo_1909_15_30.pdf (viewed April 25, 2026).

Accordingly, only where the potential effects of a proposed action are certain to be insignificant, and scoping does not reveal otherwise or raise uncertainty, may USFS invoke a categorical exclusion. The determination of the significance of the potential effects requires USFS to consider the direct, indirect, and cumulative effects and impacts of past, present, and reasonably foreseeable future actions. *See* FSH 1909.15, Chapter 31.3.

In addition, even if a project qualifies under a CE category, where "extraordinary circumstances" are present and may be affected, an agency may not invoke a categorical

14

exclusion and USFS should prepare an EA or EIS instead. 36 C.F.R. §220.6(a) and (b). USFS has developed criteria specifying resource conditions that must be considered in determining whether "extraordinary circumstances" related to a proposed action make the use of a categorical exclusion inappropriate and whether the proposed action warrants further analysis in an EA or EIS. 36 C.F.R. §220.6(a) and (b); Forest Service Handbook §1909.15, Chapter 31.2.

For this case, the critical "extraordinary circumstances" that must be considered by USFS before using a categorical exclusion include, but are not limited to, consideration of the impacts to "American Indians and Alaska Native religious or cultural sites." 36 C.F.R. §220.6(b)(1)(vi). Similarly, the new CE rules states that:

> The resources to screen for in the potentially affected environment when considering extraordinary circumstances may include, but are not limited to: …. sites … of historic… significance, as designated by Federal, Tribal, State, or local governments, or property eligible for listing on the National Register of Historic Places.

7 C.F.R. §7.1b.3(f)(1)(vii).

The record in this case demonstrates that the approved mineral exploration project will not be completed within one year and that Pe'Sla and surrounding lands qualify under the applicable "extraordinary circumstances" requirements.

B.    *The Project Operations, Which Include the Required Reclamation, Will Not Be Completed Within One Year, and Thus Do Not Qualify for the Asserted Categorical Exclusion.*

1.    Forest Service Mining Regulations Consider Multi-year Reclamation as an Integral and Necessary Part of Exploration Operations.

To avoid full public and NEPA review, the agency relied upon CE-8 for "Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than 1 mile of low standard road, or use and minor repair of existing roads." 36 C.F.R. §220.6(e)(8) ("CE-8")(repromulgated in July 2025 at 7 C.F.R. §7.1.b.4(d)(32)).

But based on the company's proposal, as approved by the agency, project operations will

15

**not** be completed within the required one year, and will take at least another three years to complete. Under USFS mineral regulations, the required reclamation of the impacts from the exploration are considered part of the mineral exploration "operations" approved by Forest Service. 36 C.F.R. §228.3(a). All aspects of the Project, including monitoring and reclamation, are considered part of the authorized "operations."

The regulations define "operations" as "[a]ll functions, work and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto." 36 C.F.R. §228.3. Under these regulations, the agency can only approve activities that can be reclaimed. In detailing the reclamation requirements, the regulation specifically includes rehabilitation/restoration of public lands as part of reclamation component of a mineral exploration plan:

> [O]perator shall, where practicable, reclaim the surface disturbed in operations by taking such measures as will prevent or control onsite and off-site damage to the environment and forest surface resources including:
>
> (1) Control of erosion and landslides;
>
> (2) Control of water runoff;
>
> (3) Isolation, removal or control of toxic materials;
>
> (4) Reshaping and revegetation of disturbed areas, where reasonably practicable; and
>
> (5) Rehabilitation of fisheries and wildlife habitat.

36 C.F.R. §228.8(g). As detailed in the USFS's Anatomy of a Mine regulatory guidance report, reclamation is a critical and required component of a mineral exploration plan:

> Satisfactory reclamation should emphasize three major objectives:
>
> 1. The productivity of the reclaimed land should at least equal that of the premine surface. This does not necessarily mean that the site must be restored to an approximation of its original condition, or that surface uses after mining will be the same as those existing prior to mining. For example, an area used for marginal grazing prior to mining may be changed to a useful and attractive recreational complex, or perhaps in another case to a housing area.
>
> 2. Satisfactory reclamation should leave the mined area in a condition that will not contribute to environmental degradation either in the form of air- or water-borne materials, or from chemical pollution.
>
> 3. The reclaimed area should be esthetically acceptable and it should be safe for the uses intended.

16

"Anatomy of a Mine, From Prospect to Production," USDA Forest Service, General Technical Report INT-GTR-35, Revised February 1995, at 68-69. https://www.fs.usda.gov/geology/includes/minerals/anatomy_mine.pdf (viewed April 23, 2026).

Thus, the Forest Service cannot plausibly divorce the required reclamation from the project "operations" in determining whether the "operations" will be completed within the strict one-year limit for CE-8 to apply. But that is what the agency did here.

2.    The Agency and Project Applicant Acknowledge That Project Operations Will Not Be Completed Within a Year.

The company and agency admit that the required reclamation will **not** be completed within the required one-year limit, as additional work in future years will be needed before reclamation is completed:

> PLS will commit to annual field inspections of drill sites and the lay-down area in conjunction with USFS and SD DANR staff (whenever possible) to cover areas used and occupied by PLS under this Plan of Operations to monitor for reclamation effectiveness and noxious weed infestations for 3 years. Such field inspections will be documented with photographs or written descriptions. Field inspection information will be compiled at the end of each field season and provided to the USFS.

PoO at 14 (Exhibit 2).

> If the above reclamation efforts do not meet the established criteria required for bond release, **PLS will collaborate with the USFS representative and make modifications to the site**, incorporating such changes and additional procedures as may be expected to provide reclamation to the stated standard.

PoO at 14 (emphasis added).

PLS further acknowledges that the required revegetation can only occur in the proper season, which could result in work done after the one-year limit.

> Re-vegetation will be accomplished as soon as possible; however, will be performed in the proper season in accordance with accepted agricultural and reforestation practices identified in consultation with USFS personnel on a site-specific basis.

PoO at 14.

17

The USFS Decision also admits that the required reclamation will not be completed within the one-year limit: "All areas of ground disturbance would be monitored for noxious weeds **and treated for two to three years post-disturbance** following Forest Service standards for treatment methods." DM at 11 (emphasis added).

In addition, under USFS mining regulations, PSL is required to submit a "reclamation cost estimate/financial assurance" (or bond). 36 C.F.R. §228.13. PLS admits that it will not request release of the reclamation bond until **three years** of monitoring and reclamation is completed: "Release of the reclamation bonds for a specific drill site will be requested when: Monitoring indicates that reclamation measures have effectively prevented or controlled onsite and off-site damage to the environment and forest surface resources for three years and such prevention is expected to continue." PoO at 14.

Thus, whether or not drilling may finish in one year, Project operations "in connection with" and "reasonably incident" to the actual exploration (as defined in 36 C.F.R. §228.3(a)) will not be completed until up to three years or more after drilling is completed. As such, the Project operations, taken as a whole as mandated by the agency regulations, does not meet the "1 year or less" requirement of CE-8 utilized by the agency here.

3.      Federal Courts Have Rejected the Same Forest Service Rational Relied Upon Here.

The agency's failure to consider the required multi-year required reclamation as part of the approved "operations," and thus did not count towards the one-year limit in CE-8, has been repeatedly rejected by federal courts. The District of Arizona, in ruling against the Forest Service's approval of a mineral exploration project on essentially the same facts, held that since monitoring of reclamation success would last three years, and that reclamation based on that monitoring "may be required during the three-year monitoring period" – the situation here – the agency could not use the "short-term" CE-8 mineral exploration category:

> Defendants argue that this three-year monitoring period should not be considered part of the project's duration because all ground-disturbing project activities will be completed before the monitoring period begins; however, the Decision

> Memorandum anticipates that additional ground disturbing reclamation activities may be required during the three-year monitoring period. USFS's determination that the project can be completed in one year or less is unsupported by the record.

*Defenders of Wildlife v. U.S. Forest Service*, Order p. 8, 4:14-cv-02446-RM (D. Ariz., 2015)(Exhibit 1).

Here, in an attempt to avoid the one-year limit, the DM asserts that "[i]f project activities must extend beyond that time, additional environmental analysis would be necessary." DM at 4. Yet that attempt to rely on future review and reclamation to fit the project under the one-year limit was squarely rejected by the court in *Defenders:*

> USFS argues that, if additional reclamation work is required during the three-year monitoring period, the additional reclamation work would be reviewed under NEPA. However, the reclamation work is already contemplated in and authorized by the Decision Memorandum, with no indication in the record that the already-approved reclamation design features would require a new Plan of Operations or further review and approval.

*Defenders* Order at 8, n.5. "Therefore, USFS's approval of the project using the categorical exclusion for short-term mineral explorations pursuant to 36 C.F.R. §220.6(e)(8) was arbitrary and capricious." *Id*. at 8.

Similarly, in a more recent case, in vacating the Forest Service's attempt to avoid the one-year limit in CE-8 by designating the post-drilling reclamation as a separate project, the Ninth Circuit confirmed that the post-drilling reclamation monitoring and potential work are part of project "operations," and must be counted in determining whether the project can be completed within the one-year limit in CE-8, 36 C.F.R. §220.6(e)(8).

> Forest Service's mineral regulations, which establish that **reclamation cannot be bifurcated from other mineral exploration efforts**. Specifically, the mineral regulations govern mineral exploration "operations." 36 C.F.R. pt. 228.3(a). Operations encompass "[a]ll functions, work, and activities in connection with" mineral exploration. § 228.3(a). This definition necessarily includes reclamation because mineral operations are required under § 228.8 to meet certain environmental protection procedures, including revegetation and wildlife habitat rehabilitation. § 228.8(g).

*Friends of the Inyo v. U.S. Forest Service*, 103 F.4th 543, 552 (9th Cir. 2024)(emphasis added).

As the Circuit further noted:

In fact, operators must submit a 'proposed plan of operations' to the Forest Service that describes 'measures to be taken to meet the requirements for environmental protection in § 228.8,' § 228.4(c)(3), and the Forest Service must then review the plan's environmental impact, §§ 228.4(a)(4), (b), 228.5(a)–(b). **The Forest Service thus necessarily reviews mineral exploration and reclamation as a single proposed project**.

*Friends of the Inyo*, 103 F.4th at 552 (emphasis added).

The Forest Service cannot escape this directly-on-point federal caselaw. Thus, because the mandated and required reclamation operations in this case – essentially the same as in *Defenders* and *Friends of the Inyo* – will last beyond one year, the project does not qualify for the relied-upon CE category and the agency's decisions violate NEPA and its implementing regulations.

C.      *The Project's Significant Impacts to Pe'Sla Are an "Extraordinary Circumstance" Which Disqualifies the Application of a Categorical Exclusion.*

The agency's reliance on the CE to avoid public review also contradicts the evidence in the record that the extensive drilling, road construction, and other industrial operations within the Pe'Sla landscape (affecting not only the cultural uses on the specific Pe'Sla protected acreage but the larger cultural landscape within the Forest Service's 2-mile MOU buffer) represents an "extraordinary circumstance" which precludes use of any CE. Where "extraordinary circumstances" are present and may be significantly affected, an agency cannot invoke a categorical exclusion and USFS must prepare an EA or EIS instead. 36 C.F.R. §220.6(a) and (b)(previous CE rules); 7 C.F.R. §1b.3(f)(new CE rules).

For this case, the critical "extraordinary circumstances" that must be considered by USFS before using a categorical exclusion include, but are not limited to, consideration of the impacts to "American Indians and Alaska Native religious or cultural sites." 36 C.F.R. §220.6(b)(1)(vi). Similarly, the new CE rules states: "The resources to screen for in the potentially affected environment when considering extraordinary circumstances may include, but are not limited to …. sites … of historic… significance, as designated by Federal, Tribal, State, or local governments, or property eligible for listing on the National Register of Historic Places." 7

C.F.R. §1b.3(f)(1)(vii).

Despite the voluminous submittals by Plaintiffs, as well as numerous Tribal governments, detailing the significant impacts from the project to Pe'Sla and the surrounding cultural landscape, the USFS based its CE on its unsupported statement that "[t]here are no known Native American or Alaska Native religious or cultural sites within the project area." DM at 20. But as detailed by the record, and evidenced by the Declarations of Plaintiffs' members noted below, this is wrong as a factual matter, as the project will adversely and significantly affect cultural and religious uses of Pe'Sla and its surrounding landscape by Plaintiff members and the public. At a minimum, as shown by these Declarations, the noise from the constant drilling will reverberate across the landscape, adversely affecting the ongoing and recognized cultural and religious uses of the protected Pe'Sla acreage. *See* NDN Collective Exhibits 5, 6, 7.

The agency's refusal to consider the impacts to Pe'Sla also contradicts the Forest Service's commitment to the Tribes to protect these lands, including a 2-mile-wide radius of Pe'Sla. As detailed above, in the 2024 binding Memorandum of Understanding ("MOU") between the Forest Service and the various Tribes of the Great Sioux Nation, the agency committed to: "Co-stewardship of Black Hills National Forest lands, including lands within 2-mile radius of Flag Mountain and Pe'Sla Tribal Trust lands, see Appendix A map, and Black Elk Wilderness." (Exhibit 4). The project is within the 2-mile radius of Flag Mountain and Pe'Sla Tribal Trust lands identified in the MOU.

In any event, the test for whether there may be "extraordinary circumstances" is **not** limited to the project's drilling and road construction footprint, as USFS maintains. Rather,

> [w]hen applying categorical exclusions, USDA subcomponents [USFS] **shall consider relevant resources in the potentially affected environment for which an extraordinary circumstance may exist** that would require the action to instead be documented in an environmental assessment (when there is uncertainty regarding the degree of effect) or an environmental impact statement (if it is determined there is a reasonably foreseeable significant impact).

7 C.F.R. §1b.3(f)(emphasis added).

Here, in determining that there were no "extraordinary circumstances," the agency failed to analyze the project's impacts to the "potentially affected environment," which necessarily includes impacts to Pe'Sla and the surrounding cultural landscape, resources and uses recognized by the agency in the Tribal MOU.

The agency's failure to evaluate uses of Pe'Sla, and the impacts to the Pe'Sla landscape, also violated its commitment in the MOU, among other requirements, that "Forest Service Interdisciplinary Teams shall seek input from designated Tribal indigenous ecological knowledge holders and THPOs during analysis and planning processes for land management activities." MOU at 5, ¶ IV.E.

Lastly, and further demonstrating the arbitrary and illegal focus on just the actual drilling "site" acreage, the agency's self-imposed limit of its "extraordinary circumstances" analysis to just the "project area," and not the project's access routes/activities, ignores the agency's mining regulations which consider all access roads as part of the project "operations." 36 C.F.R. §228.3(a)(defining "operations" as "including roads and other means of access."). As shown in the attached maps, these existing, and to-be-constructed roads are all within the MOU's 2-mile buffer, and are used by Lakota peoples, including Plaintiffs' members, to access these lands, including the Pe'Sla site.

Thus, USFS's failure to consider the impacts to Pe'Sla and the surrounding cultural landscape outside of the limited "project area" acreage renders its Decision arbitrary and capricious and not in compliance with NEPA and its implementing regulations.

## II.    **Injunctive Relief is Needed to Prevent Irreparable Harm**

Injury to Plaintiffs and the Pe'Sla landscape is imminent. Without any notice by the Forest Service to the public or affected Tribes, Plaintiffs have just recently become aware that the company has already commenced initial drilling and road construction. These industrial operations irreparably harm Plaintiffs' members' use of the Pe'Sla landscape and public lands impacted by the project's drilling, road construction and industrial activities. This is especially

22

urgent, for as shown in the Declarations, **sacred religious ceremonies in the Pe'Sla area will begin on May 2, which will be directly affected by project operations.**

This Court should issue preliminary injunctive relief to prevent imminent and irreparable harm to Plaintiffs, Pe'Sla, and the environment. *Winter*, 555 U.S. at 20. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). *See also Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 996 (8th Cir. 2011)(court affirmed issuance of preliminary injunction against federally-approved development project, quoting *Amoco*). "[P]laintiff need not prove with absolute certainty that injury will occur, but must demonstrate that irreparable harm is likely without injunction." *Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Department of Revenue*, 781 F.Supp.3d 724, 730 (S.D. Iowa 2025).

Plaintiffs submit detailed declarations showing the imminent harm from the project's drilling, road construction and ground clearing in the Pe'Sla area: Exhibit 5, Nick Tilsen (CEO and Founder, NDN Collective); Exhibit 6, Valeriah Big Eagle (Director of He Sapa Initiatives, NDN Collective); Exhibit 7, Wizipan Garriott (President, NDN Collective); Exhibit 8, Dr. Lilias Jarding (Executive Director, Black Hills Clean Water Alliance, and member of Earthworks).

Each establish that the project is already causing and will continue to cause immediate and irreparable harm to the declarants personally, to their organizations, and to their members. The harms span four independent but interrelated categories: (1) harm to sacred and cultural practices at Pe'Sla; (2) harm to water quality and drinking water resources; (3) ecological harm to a rare landscape; and (4) permanent loss of procedural rights under NEPA. "The harm to NDN Collective constituents, the Tribes, the Native American community and to me and my family is happening right now. PLS has already began drilling into the land and the aquifer in exact locations that we have picked medicines before." Tilsen Decl. ¶15. Tilsen personally visited the site and found that "access roads were carved into the landscape, ripping up the plants and

23

medicines that grow in Pe'Sla" and that "a site that I have picked medicines at as recently as last spring is now replaced with a drilling machine that is leaking oil and hydraulic fluid onto the earth." *Id*. He adds: "The topsoil at the site has been completely scraped off killing off the medicines, and plants that I once harvested there. It looks like there is water and chemicals of some kind dripping out of the machinery and there is no mitigation being done to protect the earth." *Id*.

Valeriah Big Eagle similarly confirms: "On April 21, 2026, NDN Collective became aware that PLS has commenced drilling operations." Big Eagle Decl. ¶16.  All NDN Collective declarants establish deep, ongoing, and personally observed spiritual ties to Pe'Sla, and each identifies specific upcoming ceremonial activities that will be directly and immediately impaired.

Nick Tilsen describes a lifetime of sacred use: "I have come to Pe'Sla for 43 years for sacred ceremonies. I have attended over 40 ceremonies at Pe'Sla and picked medicines on over 40 different occasions." Tilsen Decl. ¶6. His most recent visits were April 1, 10, 15, 21, and 23, 2026 — all within weeks of filing. *Id*. He states that ongoing "ceremonies will be directly impaired by the project operations, including disruption and interference by noise and visual intrusion," and that "[t]hese ceremonies cannot be completed in the midst of industrial noise and activity, effectively eliminating our ceremonial use of Pe'Sla." Tilsen Decl. ¶15. He further describes the irreversible nature of this harm: "The disruption of this land by industrial drilling operations would represent an irreparable harm to these living traditions and to the communities NDN Collective serves." Tilsen Decl. ¶8.

Valeriah Big Eagle confirms a ceremony is imminent: "The Lakota spiritual calendar, which is linked to times of the year when ceremonies are conducted at sacred sites in He Sapa, indicates that ceremony will be held at Pe'Sla in May 2026." Big Eagle Decl. ¶16. She states that she "is personally aware that this ceremony will occur and that NDN Collective members and their relatives plan to take offerings at Pe'Sla on May 2, 2026, which will be directly impacted by industrial mining activity." *Id*. Her own most recent visit to Pe'Sla for a prayer gathering was April 21, 2026. Big Eagle Decl. ¶6. She characterizes these harms as irreversible: "Once drilling

24

begins, the industrial activity at the site will disrupt ceremonial activities that have occurred there since time immemorial." Big Eagle Decl. ¶16.

Wizipan Garriott explains that Pe'Sla is not merely historically significant — it is an active, required destination in living Lakota spiritual practice. He describes how "the Lakota must be in specific places in the Black Hills, mirroring the movement of the stars" during specific times of year as part of what is known as "the journey," of which "Pe'Sla is the second stop on this annual journey." Garriott Decl. ¶8. He states: "To be Lakota requires free, unfettered, and undisturbed access to Pe'Sla, especially during the Spring season." *Id*. Mr. Garriott personally plans to participate in ceremonies at Pe'Sla during the first week of May and in a personal ceremonial activity in May "that requires solitude, silence, and peacefulness." Garriott Decl. ¶18. He attests that:

> industrial mining activity, such as drilling, cutting of trees, grading of roads, hauling of industrial supplies, storage containers, heavy diesel industrial equipment, and muddy drainage expelling industrial waste directly impairs NDN Collective's ability and my personal ability to engage in and continue the ceremonial activities that my ancestors have conducted for thousands of years, because it disrupts prayer and meditation, defaces the land from which I gather medicinal and ceremonial plants, and poisons the pure, clean water that we use for ceremonies.

*Id*.

Despite the overwhelming evidence submitted by NDN Collective, numerous Tribal governments, BHCWA, and Earthworks, and over 2,200 members of the public, the DM states that "there are no known Native American or Alaska Native religious or cultural sites within the project area" — a finding that, as Ms. Big Eagle and Mr. Garriott each note, "is flatly contradicted by the record and by the Department of Interior's own recognition of Pe'Sla's significance." Big Eagle Decl. ¶12; Garriott Decl. ¶14.

In addition, the irreparable harm from the drilling and other project operations is not limited to the impending cultural and religious ceremonies and uses. "Pe'Sla sits within the watershed that supplies drinking water to Rapid City, Ellsworth Air Force Base, and

communities and reservation lands down the Cheyenne River to the Missouri River" and that "[t]he area is underlain by an unpredictable network of fractured rock formations in which groundwater pathways are poorly understood. Exploratory drilling into this geology poses a serious risk of contaminating water supplies that cannot be fully anticipated or reversed. Once contamination occurs, it cannot be undone." Tilsen Decl. ¶16. *See also* Jarding Decl. ¶10 (Water Quality).

The DM's reliance on "in-ground infiltration galleries to manage drilling water — essentially open trenches designed to allow drilling fluids and cuttings to percolate into the ground" are "particularly concerning in this fractured-rock hydrogeologic setting, where contaminants introduced at the surface can migrate unpredictably through the subsurface." *Id*. "The risk of contamination to and overuse of that water supply — risks the USFS never evaluated because it bypassed full NEPA review — is a concrete and immediate threat to my health and safety." Jarding Decl. ¶17.

Dr. Jarding also provides extensive testimony on the ecological irreversibility of the Project's impacts. Pe'Sla supports "a Black Hills Montane Grassland ecosystem — a globally rare and endemic plant community found only in the Black Hills of western South Dakota and northeastern Wyoming." Jarding Decl. ¶10 (Ecological Impacts). This habitat "depends on intact soil structure and minimal surface disturbance; industrial drilling, road construction, increased traffic, and water brought in from other locations would disturb these soils and plant communities in ways that cannot be fully restored within any reasonable timeframe, if at all." *Id*. She specifically identifies the risk of noxious weed invasion — a risk the USFS's own reclamation requirements acknowledge by requiring two to three years of post-disturbance weed treatment — as "a particular long-term threat to the rare native plant communities at Pe'Sla." *Id*. "Once disturbed by industrial operations, the soil-plant communities of this rare grassland type cannot be restored to their prior condition within any reasonable timeframe." Jarding Decl. ¶18.

Lastly, the declarants establish that the USFS's use of a categorical exclusion — without conducting a full Environmental Assessment or Environmental Impact Statement — has already

and permanently deprived them of their right to meaningful participation in the environmental review process. "As ground-disturbing operations proceed, the procedural right to meaningful public participation in the review of those operations is permanently lost." Tilsen Decl. ¶17; Big Eagle Decl. ¶17; Garriott Decl. ¶19; Jarding Decl. ¶19. As the Eighth Circuit held:

> [T]his court has found that failure to comply with NEPA, "causes harm itself, specifically the risk that real environmental harm will occur through inadequate foresight and deliberation." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011)(internal quotations omitted)(recognizing the "difficulty of stopping a bureaucratic steam roller, once started" (internal quotations omitted)). Harm to the environment "may be presumed when an agency fails to comply with the required NEPA procedure." *Id*.

*Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers,* 826 F.3d 1030, 1037 (8th Cir. 2016).

Overall, the four declarations collectively establish that the irreparable harm from the project has begun, with drilling already underway and sacred ceremonies planned within days. "[T]he cultural, religious, and ecological values of Pe'Sla, once damaged by industrial drilling operations, cannot be restored or compensated through money damages." Tilsen Decl. ¶13.

## III.    The Balance of Equities and Public Interest Support an Injunction

The "balance of equities" and "public interest" factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The balance of equities and public interest here support preliminary injunctive relief.

The injuries that the project will inflict on the environment and Plaintiffs' interests are irreversible or at least of long duration, including the immediate impact to the Pe'Sla landscape for cultural and religious purposes starting on May 2nd. There is no hardship to the agency while this court considers the merits of the case. In addition, any potentially-asserted arguments from the project proponent would likely consist of delayed economic hopes and would last only until this court's resolution of this case on the merits, and the agency's compliance with its statutory duties to conduct a legitimate NEPA analysis. But such impacts do not supersede the public interest in preventing harms to these invaluable resources. As the Eighth Circuit held:

27

> We agree that, just as important as the public interest in potential economic gains is "the public's confidence that its government agencies act independently, thoroughly, and transparently when reviewing permit applications." *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir.2002). The "environmental dangers at stake in this case are serious," and the public interests that might be injured by a preliminary injunction, such as temporary loss of jobs or delays in increasing energy output in the region, "do not outweigh the public interests that will be served." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir.2011).

*Sierra Club*, 645 F.3d at 997-98. *See also S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 588 F.3d 718, 728 (9th Cir. 2009)(balance of hardships favored plaintiff in challenge to mining project because principal hardship to project developer was "economic" and "may for the most part be temporary").

Further, "[A]fter a defendant has been notified of the pendency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his peril and subject to the power of the court to restore the status, wholly irrespective of the merits as they may be ultimately decided." *Jones v. SEC*, 298 U.S. 1, 17-18 (1936)). *See also Porter v. Lee*, 328 U.S. 246, 251 (1946)("It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo.").

**IV.     The Court Should Impose No Bond or Only a Nominal Bond**

In issuing the requested injunctive relief, the Court should require no or only a nominal bond. *See* Fed. R. Civ. Proc. 65(c)(plaintiff must generally post a bond "in such sum as the court deems proper"). The Eighth Circuit recognizes the district court's discretion to waive the bond requirement (or require only a nominal bond) in cases vindicating the public interest, such as here. "[C]ourts have not required a bond, or have only required a minimal bond, because of the important public interest in the enforcement of NEPA." *Richland/Wilkin Joint Powers Authority v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016). "[T]he Eighth Circuit has approved of a district court waiving the bond requirement based on 'the important public interest in the enforcement of' federal law. (collecting cases where district courts required no, or minimal, bond where injunctions enforced the National Environmental Policy Act)."

28

*Tincher v. Noem,* No. 0:25-cv-4669 (KMM/DTS), 2026 WL 125375, *35 (D. Minn, Jan. 16, 2026), relying on *Richland/Wilkin.*

Where, as shown by Plaintiffs' Declarations, (Exhibits 5, 6, 7, 8, 9), Plaintiffs are nonprofit organizations seeking to vindicate an established public interest in cultural resource and environmental protection, courts routinely waive the bond requirement or impose a nominal bond. "It is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest." *Hualapai Indian Tribe v. Haaland*, No. CV-24-08154-PCT-DJH, 2024 WL 4678059, *21 (D. Az, Nov. 5, 2024)(issuing preliminary injunction, without any bond, which extended an earlier temporary restraining order, against the federal land agency's approval of a mineral exploration project that threatened the Hualapai Tribe's sacred spring).

Due to the critical public interest issues raised in this case, as well as the impending immediate irreparable, Plaintiffs respectfully request that this Court do likewise.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a temporary restraining order and preliminary injunction to prohibit further industrial intrusions into the Pe'Sla cultural landscape until Plaintiffs' claims can be adjudicated on the merits.

Respectfully submitted this 27th day of April, 2026,

*/s/ Tracey Zephier*
Tracey Zephier (SD Bar #3058)
408 Knollwood Drive
Rapid City, SD 57701
(605) 791-3999
tracey@ndncollective.org

Bruce Ellison (SD Bar # 462)
P.O. Box 2508
Rapid City, SD 57709
(605) 858-1850
Bruce.Ellison4@gmail.com

Roger Flynn (CO Bar #21078) *Pro Hac Vice*
Jeffrey C. Parsons (CO Bar #30210) *Pro Hac Vice*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738
roger@wmaplaw.org
jeff@wmaplaw.org

Attorneys for Plaintiffs

Certificate of Service

I, Tracey Zephier, attest that I filed the foregoing and all exhibits with this Court's ECF filing system on this 27th day of April, 2026. In addition, I sent, via email on this date, the foregoing and all exhibits to the Office of the U.S. Attorney for the District of South Dakota, which has yet to enter its appearance on behalf of Defendants in this case.

*/s/ Tracey Zephier*