UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| NDN COLLECTIVE; BLACK HILLS CLEAN WATER ALLIANCE; EARTHWORKS,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; JAMES GUBBELS, in his official capacity as District Ranger,<br><br>        Defendants. | 5:26-cv-05035-CCT<br><br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 1

II. LEGAL BACKGROUND ..................................................................................... 2

III. STANDARD OF REVIEW ................................................................................... 3

IV. FACTUAL BACKGROUND ................................................................................ 5

V. ARGUMENT ....................................................................................................... 9

    A. Plaintiffs are not likely to succeed on the merits of their claims. ........................... 9

        1. The agency properly applied a CE to the Project. ......................... 9

        2. No extraordinary circumstances exist that could cause significant environmental impacts. ................................................ 14

    B. Plaintiffs have not established irreparable harm. .................................................. 17

    C. The balance of equities and public interest favor allowing the Project to proceed. .............................................................................................................. 22

    D. The doctrine of unclean hands bars Plaintiffs from equitable relief. .................... 24

    E. If the Court enjoins the activities, Plaintiffs are required to post a bond. ............. 25

VII. CONCLUSION .................................................................................................. 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Ctr. for Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999) .................................................................................. 14

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
480 U.S. 531 (1987)................................................................................... 17, 19, 23

*Atomic Oil Co. of Okl. v. Bardahl Oil Co.*,
419 F.2d 1097 (10th Cir. 1969) ............................................................................. 25

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983)................................................................................................... 3

*Chatz v. Freeman*,
204 F.2d 764 (7th Cir. 1953) ................................................................................. 25

*Crow Creek Sioux Tribal Farms, Inc. v. U.S. I.R.S.*,
684 F. Supp. 2d 1152 (D.S.D. 2010) ..................................................................... 21

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) ................................................................................. 2

*Dataphase Systems, Inc. v. C L Systems, Inc.*,
640 F.2d 109 (8th Cir. 1981) ................................................................................... 4

*Davis v. Mineta*,
302 F.3d 1104 (10th Cir. 2002) ............................................................................. 17

*Defenders of Wildlife v. United States Forest Service*,
No. CV-14-02446-TUC-RM, 2015 WL 14070482 (D. Ariz. Sept. 15, 2015) ................... 12, 13

*Dep't of Educ. v. Brown*,
600 U.S. 551 (2023)............................................................................................... 18

*Dine Citizens Against Ruining Our Env't v. Jewell*,
No. 15-cv-209 JB-SCY, 2015 WL 4997207 (D.N.M. Aug. 14, 2015).................................... 17

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
952 F.2d 802 (4th Cir. 1991) ................................................................................... 4

*Downer v. U.S. By & Through U.S. Dep't of Agric. & Soil Conservation Serv.*,
97 F.3d 999 (8th Cir. 1996) ................................................................................... 11

*Env't Def. Fund, Inc. v. Froehlke*,
477 F.2d 1033 (8th Cir. 1973) ............................................................................... 17

*Friends of the Inyo v. United States Forest Service*,

103 F.4th 543 (9th Cir. 2024) ................................................................................... 13

*Friends of the Wild Swan v. Weber*,
  767 F.3d 936 (9th Cir. 2014) ................................................................................ 16

*Gateway, Inc. v. Companion Prods., Inc.*,
  2002 DSD 27, 320 F. Supp. 2d 912 (D.S.D. 2002) ................................................ 24

*General Mills, Inc. v. Kellogg Co.*,
  824 F.2d 622 (8th Cir. 1987) ................................................................................... 5

*Harris v. Blue Cross Blue Shield of Mo.*,
  995 F.2d 877 (8th Cir. 1993) ................................................................................... 4

*Hopkins v. Wallin*,
  179 F.2d 136 (3d Cir. 1949) ................................................................................... 25

*Keystone Driller Co. v. Gen. Excavator Co.*,
  290 U.S. 240 (1933)................................................................................................ 24

*Klamath-Siskiyou Wildlands Ctr. v. Grantham*,
  785 F. App'x 467 (9th Cir. 2019) ........................................................................... 22

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976)................................................................................................ 16

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ................................................................................. 22

*Lopez v. Brewer*,
  680 F.3d 1068 (9th Cir. 2012) ................................................................................. 4

*Maryland Dep't of Human Res. v. Dep't of Agric.*,
  976 F.2d 1462 fn. 21 (4th Cir. 1992) ..................................................................... 25

*Mayor & City Council of Balt. v. Trump*,
  429 F. Supp. 3d 128 (D. Md. 2019)......................................................................... 3

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)....................................................................................... 5, 17, 18

*Native Ecosystems Council v. Krueger*,
  40 F. Supp. 3d 1344 (D. Mont. 2014).............................................................. 19, 20

*Ng v. Bd. of Regents of Univ. of Minnesota*,
  64 F.4th 992 (8th Cir. 2023) .................................................................................. 21

*Nken v. Holder*,
  556 U.S. 418 (2009)........................................................................................... 4, 22

*Nordin v. Nutri/System, Inc.*,
  897 F.2d 339 (8th Cir. 1990) ................................................................................... 4

*Ohio Valley Env't Coal. v. Aracoma Coal Co.*,

556 F.3d 177 (4th Cir. 2009) .......................................................................................... 3

*Patagonia Area Resource Alliance v. United States Forest Service,*
 No. CV-23-00280-TUC-JGZ, 2023 WL 5723395 (D. Ariz. Sept. 5, 2023)............................ 12

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,*
 324 U.S. 806 (1945)...................................................................................................... 24

*Richland/Wilkin Joint Powers Authority v. United States Army Corps. of Engineers,*
 826 F.3d 1030 (8th Cir. 2016) ...................................................................................... 17

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
 747 F.3d 581 (9th Cir. 2014) ........................................................................................ 3

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.,*
 657 F. Supp. 2d 1233 (D. Colo. 2009)........................................................................... 17

*Sanborn v. Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.,*
 997 F.2d 484 (8th Cir. 1993) ................................................................................... 4, 5

*Save Our Sonoran, Inc. v. Flowers,*
 408 F.3d 1113 (9th Cir. 2005) ...................................................................................... 17

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,*
 (*Seven County*), 605 U.S. 168 (2025) ...................................................... 1, 2, 3, 13

*Sierra Club v. U.S. Army Corps of Eng'rs,*
 645 F.3d 978 (8th Cir. 2011) ........................................................................................ 17

*Stockslager v. Carroll Elec. Coop. Corp.,*
 528 F.2d 949 (8th Cir. 1976) ........................................................................................ 25

*Summers v. Earth Island Inst.,*
 555 U.S. 488 (2009)................................................................................................ 18, 20

*Telex Corp. v. IBM,*
 464 F.2d 1025 (8th Cir. 1972) ...................................................................................... 25

*United Indus. Corp. v. Clorox Co.,*
 140 F.3d 1175 (8th Cir. 1998) ....................................................................................... 4

*United Keetoowah Band of Cherokee Indians in Okla. v.FCC,*
 933 F.3d 728 (D.C. Cir. 2019)........................................................................................ 2

*United States v. Coleman,*
 390 U.S. 599 (1968)...................................................................................................... 22

*United States v. Green Acres Enters., Inc.,*
 86 F.3d 130 (8th Cir. 1996) .......................................................................................... 17

*Voyageurs Nat'l Park Ass'n v. Norton,*
 381 F.3d 759 (8th Cir. 2004) ........................................................................................ 15

*Watkins Inc. v. Lewis,*

346 F.3d 841 (8th Cir. 2003) ........................................................................ 17

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982)................................................................................. 22

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ....................................................................... 4, 17, 22

*Yakus v. United States,*
    321 U.S. 414 (1944)................................................................................. 26

**Statutes**

30 U.S.C. § 1606.............................................................................................. 23

30 U.S.C. § 22.................................................................................................. 22

36 C.F.R. § 220.6(e)(8)(vii) ............................................................................ 12

42 U.S.C. § 4336(b)(1)-(2) ............................................................................... 2

42 U.S.C. § 4336e(1) ......................................................................................... 2

42 U.S.C. §§ 4332(C)(2)..................................................................................... 2

42 U.S.C. §§ 4336(e)(1)...................................................................................... 2

5 U.S.C. § 706.................................................................................................... 3

5 U.S.C. § 706(2)(A)........................................................................................... 3

**Rules**

Federal Rule of Civil Procedure 65(c) ........................................................... 25

**Regulations**

36 C.F.R. § 228.1 .............................................................................................. 6

36 C.F.R. § 228.8 (g) ........................................................................................ 7

36 C.F.R. § 228.8(g) ....................................................................................... 11

36 C.F.R. Part 228, Subpart A ......................................................................... 5

7 C.F.R. § 1b.3(e).............................................................................................. 14

7 C.F.R. § 1b.3(f)(1) .......................................................................................... 14

7 C.F.R. § 1b.3(f)(1)(viii) .................................................................................. 14

7 C.F.R. § 1b.3(f)(2) .......................................................................................... 14

7 C.F.R. § 1b.4(d)(32)..................................................................................... 9, 10

**Administrative Reports & Decisions**

*Final 2025 List of Critical Minerals*, 90 F.R. 50,494 (Nov. 7, 2025) ................................... 22, 23

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

## I.      INTRODUCTION

The Forest Service recognizes Pe'Sla as a sacred site and balances its preservation with the public's right and interest in mineral development on public lands under the General Mining Act. After meaningful consultation with the Tribal governments, public involvement, and considering the potential environmental impacts consistent with the National Environmental Policy Act, the Forest Service approved Pete Lien & Sons to conduct exploratory drilling operations in search of graphite, which the U.S. Geology Survey lists as a critical mineral.

Now that operations are nearly halfway complete, Plaintiffs seek emergency injunctive relief—despite knowing that the Forest Service authorized the Rochford Exploratory Drilling Project on February 27, 2026. But Plaintiffs fail to establish any of the necessary factors to obtain emergency relief. Plaintiffs cannot establish a likelihood of success on the merits because the Forest Service properly invoked a Categorical Exclusion for projects that will be completed within one year and then reasonably determined that no extraordinary circumstances exist. Plaintiffs fail to demonstrate they will be irreparably harmed absent an injunction and instead speculate about improbable Project impacts. Plaintiffs also fail to show that the balance of equities weighs against the public interest and in their favor. Finally, the doctrine of unclean hands bars Plaintiffs from obtaining any equitable relief in this case because of the bad faith, illegal conduct that Plaintiff NDN Collective's members have engaged in at the Project site. The Court should deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, Dkt. No. 12.[1]

---

[1] As of the time of this filing, plaintiffs in the related case *Cheyenne River Sioux Tribe v. U.S. Forest Service*, 5:26-cv-5051-CCT (D.S.D.), have not accomplished service as required under Federal Rule of Civil Procedure 4(i) and instead simply emailed a copy of their complaint and motion to undersigned counsel.

## II.     LEGAL BACKGROUND

NEPA "is a purely procedural statute" that "does not require the agency to weigh environmental consequences in any particular way." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.* (*Seven County*), 605 U.S. 168, 173 (2025). It "is a procedural cross-check, not a substantive roadblock." *Id.* "Otherwise stated, NEPA does not mandate particular results, but simply prescribes the necessary process for an agency's environmental review of a project." *Id.* at 177 (citation modified).

Under NEPA, federal agencies fulfill their obligation to analyze the potential environmental impacts of major federal actions through preparation of an environmental impact statement ("EIS") if the agency determines the action will have significant environmental impacts, preparation of an environmental assessment ("EA") to assess whether the action will have significant environmental impacts, or invocation of a categorical exclusion ("CE"). *See* 42 U.S.C. §§ 4336(b)(1)-(2), 4332(C)(2) (defining EIS), 4336(e)(1) (CE) . CEs are categories of actions that normally do not have significant effects on the environment, individually or in the aggregate, and therefore do not require an EA or EIS unless extraordinary circumstances exist that make application of a CE inappropriate. 42 U.S.C. § 4336e(1). CEs are a form of NEPA compliance that streamline agency NEPA review while providing several procedural safeguards. *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1096 (9th Cir. 2013) ("Application of a [CE] is not an exemption from NEPA; rather, it is a form of NEPA compliance, albeit one that requires less than where an [EIS] or an [EA] is necessary." (citation omitted)); *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 735 (D.C. Cir. 2019) ("[CEs] are not exemptions or waivers of NEPA review; they are simply one type of NEPA review." (citation omitted)).

In assessing environmental effects under NEPA, "an agency will invariably make a series

of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry—and also about the length, content, and level of detail" of its written analysis. *Seven Cnty.*, 605 U.S. at 182-83. "Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Id.* at 183. As the Supreme Court recently "doubly underscore[d]," "inherent in NEPA . . . is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process. A reviewing court may not substitute its judgment for that of the agency as to the environmental consequences of its actions." *Id.* (citations omitted).

## III.    STANDARD OF REVIEW

Judicial review of administrative actions is governed by the Administrative Procedure Act ("APA"). 5 U.S.C. § 706; *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA standard of review, an agency's final decision must be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is "highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citations omitted). And "[e]specially in matters involving not just simple findings of fact but complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'" *Id.* (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). Ultimately, the Court's task "is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas*, 462 U.S. at 105 (citation omitted). Judicial review under the APA is limited to the agency's administrative record. *Mayor & City*

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

3

*Council of Balt. v. Trump*, 429 F. Supp. 3d 128, 137 (D. Md. 2019) (Review under the APA ordinarily "is limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." (citations omitted)).[2]

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991); *see also Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The balance of equities and public interest "factors merge when the Government" is the party opposing the preliminary injunction request. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *see also, Harris v. Blue Cross Blue Shield of Mo.,* 995 F.2d 877, 879 (8th Cir. 1993); *Nordin v. Nutri/System, Inc.,* 897 F.2d 339, 345 (8th Cir. 1990).

When applying this test, the burden on the movant is heavy, in particular where, as here, granting the preliminary injunction will give the movant substantially the relief it would obtain with a final judgment. *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir. 1998) (quoting *Sanborn v. Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 485-86 (8th Cir. 1993)). Caution must therefore be exercised in a court's deliberation, and the essential

---

[2] The agency here has not yet lodged the administrative record, but, under the record review rule set forth above, the Court's consideration of the merits still must be limited to information that was before the agency at the time it made its decision.

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

4

inquiry in weighing the propriety of issuing a preliminary injunction is whether the balance of other factors tip decidedly toward the movant and the movant has also raised questions so serious and difficult as to call for more deliberate investigation. *Id.* (quoting *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 624-25 (8th Cir. 1987)). "It is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test set out above." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 158 (2010) (instructing that "thumb on the scales" in favor of an injunction in NEPA cases is *not* warranted).

## IV.     FACTUAL BACKGROUND

In June 2024, the Mystic Ranger District on the Black Hills National Forest received a request from Pete Lien and Sons, Inc. ("Operator")—a family-owned business in Rapid City, South Dakota—to approve a Plan of Operations ("Plan") for mineral exploration on National Forest land near Rochford, South Dakota ("Rochford Project" or "Project"). Forest Service Decision Memo ("DM") 1, Dkt. No. 12-4. The Plan proposed exploration for graphite, which is a locatable mineral under 36 C.F.R. Part 228, Subpart A, to be conducted upon unpatented mining claims held by Pete Lien and Sons, Inc. *Id*. The location of the Project in relation to the Pe'Sla site—an area of cultural and spiritual importance to Native peoples taken into trust by the Federal government—is depicted below:



After the original proposed Plan was received, the Forest Service reviewed it in 2025 with an internal interdisciplinary team, resulting in required mitigation measures and design modifications to the Plan to minimize adverse environmental impacts on NFS surface resources, where feasible, as required by 36 C.F.R. § 228.1. DM 1. A modified version of the proposed Plan, with Forest Service-imposed requirements was approved by the Forest Service in a Decision Memo in February 2026. DM 23. The Decision Memo approving the Plan authorizes the Operator

to conduct mineral exploration for graphite by drilling up to 18 boreholes at a maximum depth of 1,000 feet. *Id*. at 3. Each drill site will be approximately 30 feet by 50 feet, or 0.034 acres, and there will be two 0.15-acre staging areas for storage and portable sanitation facilities. *Id*. To reach the drill site pads from roads, the operator is authorized to implement approximately 5,050 feet (less than 1 mile) of temporary overland access route improvements. *Id*. After drilling is completed, these overland routes will be restored to pre-Project conditions or as near to those conditions as practicable. *Id*.

All disturbed areas for the Project will be reclaimed concurrently where practicable and immediately following completion of use at each site. *Id*. at 4. The reclamation objectives for the Project are as follows:

1. Reclaim the surface disturbed by operations by taking such measures as to prevent or control onsite and off-site damage to the environment and forest surface resources (36 C.F.R. § 228.8 (g)).

2. Return areas disturbed by operations to a stable configuration that approximates the original condition to the extent possible. All surface areas disturbed by the operation shall be recontoured in such a way as to closely approximate either surface contours existing in the disturbed area before the start of operations or surface contours of immediately and adjacent undisturbed terrain. In all cases, resulting contours shall be made to blend and merge with surrounding natural ground surfaces in an unobtrusive way imitating natural surface features commonly found in the immediate area.

*Id*. at 14-15. To achieve these objectives, the operator is required to complete "final reclamation measures," which include, among other things, plugging drill holes consistent with South Dakota regulations, cleaning up and recontouring disturbed areas, and re-vegetating disturbed areas. *Id*. at 15-17. All drilling and reclamation activity under the Project will be completed within one year. *Id*. at 17 ("Surface disturbance activities resulting from this project, including reclamation earthwork, would be one year (12 months) or less.").

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

7

The Decision Memo explained that the Forest Service applied a CE to the Project, which completes NEPA compliance for the authorized activities. DM 2, 17-18. The Decision Memo also explained that no extraordinary circumstances exist that would cause the Project to have potentially significant environmental impacts. *Id*. at 18-21.

After the Forest Service authorized the Project through the Decision Memo in February 2026, the Operator began site work on March 27, 2026. Lien Decl. ¶ 6. The operator has finished drilling at seven drill holes and is currently drilling the eighth drill hole. Gubbels Decl. ¶ 8; Lien Decl. ¶ 7. The Operator expects to complete all of its work under the Project by May 17, 2026. Lien Decl. ¶ 9.

The Forest Service has engaged with the public for this Project since April 2025, when it published Project information to its Schedule of Proposed Actions on the Forest Service website. DM 22. This Project information was publicly accessible on the website until February 2026. *Id*. In April 2025, the Forest Service also sent out a scoping notice describing the proposed Project to 110 recipients, including adjacent landowners, interested parties, organizations, local governments, Tribes, and other government agencies. *Id*. The agency also made the scoping notice and an informational PowerPoint presentation available to the public on the Black Hills National Forest website beginning in April 2025. *Id*. The Forest Service held a public comment period for the scoping notice, responded to those comments, and updated the Plan in response to those comments. *Id*.; *see* DM App. A (summary of issues raised in public comments and agency response to those issues), attached as Exhibit 1. The agency also engaged significantly with local Tribes regarding the Project, including meeting with tribal representatives on ten separate occasions throughout 2025 and visiting tribal representatives at reservations offices multiple times in

November and December 2025 to discuss and answer questions about the Project. DM 22; *see also* Gubbels Decl. ¶ 13.

Plaintiffs filed suit challenging the Project on April 1, 2026. Dkt. No. 1. Plaintiffs' two claims allege violations of NEPA and the APA on the basis that reliance on a CE was improper because (1) the Project operations will not be completed within one year, *id.* ¶¶ 103-05; and (2) extraordinary circumstances exist, *id.* ¶¶ 106-07. Plaintiffs waited for nearly one month until Project implementation activities were well under way before moving for a temporary restraining order and preliminary injunction on April 27, 2026. Dkt. No. 12.

## V.    ARGUMENT

Plaintiffs are not entitled to emergency injunctive relief. They cannot establish a likelihood of success on the merits. Nor can they demonstrate irreparable harm. The balance of equities tips in favor of the public interest allowing the Project to proceed. Finally, Plaintiffs are not entitled to equitable relief under the unclean hands doctrine. The Court should deny Plaintiffs' Motion.

### A.    Plaintiffs are not likely to succeed on the merits of their claims.

Plaintiffs' NEPA claim is likely to fail on the merits because the Project qualifies under a CE, and the Forest Service reasonably determined that no extraordinary circumstances exist.

#### 1.    The agency properly applied a CE to the Project.

The Forest Service properly complied with NEPA by applying a CE to the Project that covers: "short-term (one year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than one mile of low standard road, or use and minor repair of existing roads." 7 C.F.R. § 1b.4(d)(32); DM 18. The DM explains that, because all surface disturbing activities

authorized under the Project—including all exploratory drilling and reclamation—will be completed within a year, the CE applies. DM 17.

Plaintiffs argue the Project's reclamation monitoring (which will last for three years to ensure effective reclamation and weed control, *id*.) will extend the Project past the one-year deadline of the CE. Pls.' Mem. in Supp. of Mot. for Temp. Restraining Or. and Prelim. Inj. 15-20 ("Pls.' Br."), Dkt. No. 12-1. Not so. All surface disturbing work, including all reclamation, authorized under the Project will occur within one year of commencement. DM 17 ("Surface disturbance activities resulting from this project, including reclamation earthwork, would be one year (12 months) or less."). Indeed, the approved Plan of Operations terminates on March 25, 2027, which is less than a year from when exploratory drilling activities began on April 14, 2026.

Monitoring to ensure reclamation activities were successful does not entail surface disturbing activities that could have environmental impacts, and there is no valid reason to interpret the CE as including mere monitoring into the "short-term (one year or less) mineral, energy, or geophysical investigations" contemplated in the CE. Although there is a small chance monitoring will require additional reclamation work after the one-year mark, "if project activities must extend beyond that time, additional environmental analysis would be necessary. Any deviation from the approved reclamation design features that would result in ground disturbance would require a new PO or further review and approval." *Id*.  Put simply, any reclamation work required after March 25, 2027 is not authorized by the Decision Memo or approved Plan and would require additional NEPA analysis and an additional authorization before implementation. This Project, then, will definitively be completed within one year and thus falls within the CE.

Plaintiffs argue the Project will take more than one year to complete because reclamation and monitoring are included within certain mining regulations' definition of mining "operations."

Pls.' Br. 15-17. But the definition of "operations" in the context of mining is near irrelevant here, as "operation(s)" does not appear in the language of the CE. 7 C.F.R. § 1b.4(d)(32); DM 18. Further, even if reclamation is included in the CE's one-year timeframe, all reclamation authorized by the Project will take place within that one-year timeframe. DM 17.

Plaintiffs also argue that the agency admitted that reclamation will go beyond one year, Pls.' Br. 17-18, but the Forest Service has conceded no such thing. Plaintiffs point to language from the DM explaining the three years of monitoring and the release of the reclamation bond (which can only occur after the three years of monitoring), *id.*, but this is not a concession that reclamation will last more than one year. As explained above, any additional reclamation work beyond one year is not authorized under this Project. Also, it is more than speculative to assume that any additional reclamation work will be required past the estimated drilling and reclamation completion date of May 17, 2026, Lein Decl. ¶ 9, much less past the one-year mark (past March 2027). This timeliness is all but assured because the Project requires extensive reclamation that the operator is completing concurrent with the drilling operations, DM 14-15; *see* Lein Decl. ¶ 7 (noting operator has already completed for seven of the drill sites). Indeed, the reclamation will be performed by an experienced operator who has successfully reclaimed similar areas in the past. Lein Decl. ¶ 13. In sum, it is entirely reasonable for the agency to assume that no additional reclamation will be needed and all ground-disturbing work associated with this Project will be completed within a year. *See Downer v. U.S. By & Through U.S. Dep't of Agric. & Soil Conservation Serv.*, 97 F.3d 999, 1002 (8th Cir. 1996) ("An agency making fact-based determinations in its own field of expertise, particularly where those determinations are wrapped up with scientific judgments, must be permitted 'to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

11

persuasive.'" (citation omitted)). And if further reclamation work is required beyond one year, it will have to be approved through a separate decision.

Attempting to get around this, Plaintiffs argue that revegetation—a required component of reclamation, *see* 36 C.F.R. § 228.8(g)—could last longer than a year. Pls.' Br. 17. But another court has squarely rejected this precise argument. In *Patagonia Area Resource Alliance v. United States Forest Service* ("*Patagonia*"), No. CV-23-00280-TUC-JGZ, 2023 WL 5723395, at *9 (D. Ariz. Sept. 5, 2023), plaintiffs argued that, "even if [the operator] can complete reclamation activities during the project's seventh month, [the operator] must monitor revegetation for more than one growing season, which, naturally, will take longer than five months." The Court was unpersuaded, finding that "[t]he CE applied here offers examples of covered operations, including construction of one-third mile of road and the clearing of an acre of vegetation for drill pads. 36 C.F.R. § 220.6(e)(8)(vii). It seems unlikely that most environments could return to pre-operation vegetation conditions less than one year after" the clearing of vegetation contemplated by the CE. *Id*. Thus, the Court held that the exploratory mining project at issue there fell within the CE and that the Forest Service "need only consider whether [the operator] could revegetate disturbed areas where reasonably practicable." *Id*. Here, the agency determined revegetation (and all other reclamation activities) can and will occur within the one-year time frame. DM 17. But, as *Patagonia* makes clear, the CE would apply even where revegetation would take longer than one year.

Plaintiffs claim *Defenders of Wildlife v. United States Forest Service*, No. CV-14-02446-TUC-RM, 2015 WL 14070482, at *4-*5 (D. Ariz. Sept. 15, 2015), is dispositive. Pls.' Br. 18-19. It is not. As demonstrated in *Patagonia*, that case is easily distinguishable. No. CV-23-00280-TUC-JGZ, 2023 WL 5723395, at *9. In *Defenders of Wildlife*, "[t]he most recent Plan of

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

12

Operations indicate[d] that the project operator anticipated the project activities, including reclamation activities, would require approximately one year and five months." No. CV-14-02446-TUC-RM, 2015 WL 14070482, at *4. Thus, the court found that the record did not support the Forest Service's decision that "all authorized ground-disturbing activities, including reclamation activites, shall be completed within one year." *Id.* This timeline of project activities was separate and apart from monitoring. *Id.* While the Court focused on the timeline for drilling and reclamation, it also mentioned that reclamation monitoring would last for three years. *Id.* And the Court suggested the three-year monitoring would not be inconsistent with application of the CE if additional reclamation due to monitoring might "require a new Plan of Operations or further review and approval." *Id.* at *4, n.5. Here, the operator expects drilling and reclamation to be completed in less than two months, Lein Decl. ¶ 9, much less the one year permitted by the CE, DM 17, and any ground-disturbing reclamation beyond one year would require additional NEPA analysis *and* an additional agency decision, *id*. The Project is entirely consistent with *Defenders of Wildlife*.

Finally, Plaintiffs' reliance on *Friends of the Inyo v. United States Forest Service*, 103 F.4th 543, 552 (9th Cir. 2024) is misplaced. Pls.' Br. 19-20. The agency decision there authorized restoration activities past the one-year mark. *Friends of the Inyo*, 103 F.4th at 550 ("Phase one will last one year, and at the end of the one-year period, all equipment will be removed, and exploration activities will be complete. In phase two, covered by CE-6 (habitat improvement), for up to three years after phase one, experts will monitor *and tend to the Project area* to ensure revegetation is successful."). There, the agency relied on CE-6 because reclamation activities could occur beyond one year, i.e., "tending to the Project area." *Id*. Here, not only does the agency not plan on reclamation occurring beyond one year, the DM *does not authorize* ground-disturbing reclamation

activities beyond one year. DM 17. Such activities would require additional NEPA analysis and a new agency decision. *Id*. Further, the Plan of Operations terminates on March 25, 2027. Therefore, the holding in *Friends of the Inyo* does not apply.

At bottom, the Forest Service reasonably determined the Project satisfies the CE's one-year limitation. That reasonable and fully supported determination is entitled to substantial deference. *See Seven County*, 605 U.S. at 182 ("[C]ourts should defer to agencies' decisions about where to draw the line" when implementing NEPA; "[A]gencies possess discretion and must have broad latitude to draw a 'manageable line.'" (citation omitted)).

### 2. No extraordinary circumstances exist that could create uncertainty about the degree of potential effect or that could lead to a reasonably foreseeable significant effect.

Under the agency's regulations, a proposed action fits within a CE, it then evaluates the action for extraordinary circumstances. 7 C.F.R. § 1b.3(e). The regulations list examples of resources the agency may wish to consider in its extraordinary circumstances review. 7 C.F.R. § 1b.3(f)(1). However, "[t]he mere presence of one or more of the resources listed in paragraph (f)(1) of this section, or as otherwise identified at the sole discretion of the responsible official, does not mean an extraordinary circumstance exists." 7 C.F.R. § 1b.3(f)(2). Rather, "the responsible official should consider if there is something unique to the actions proposed or to the condition of the affected environment or resource(s) considered that creates uncertainty about the degree of potential effect or would lead to a reasonably foreseeable significant effect." *Id*. Ultimately, "[a]n extraordinary circumstance exists only when there is reasonable uncertainty whether the degree of the effect is significant or certainty that the degree of effect is significant." *Id*. Here, the Forest Service analyzed the applicable resources and found no extraordinary circumstances exist that would render the degree of impacts uncertain or foreseeably significant. DM 17-21. That finding

was fully supported by the record and is subject to substantial deference. *See Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) ("Employing the deferential standard of review, which we must when reviewing factual conclusions within the agency's expertise, we conclude that the Forest Service considered the relevant factors and determined that no extraordinary circumstances were present.").

Plaintiffs claim that an extraordinary circumstance exists as to "American Indian and Alaska Native religious or cultural sites." 7 C.F.R. § 1b.3(f)(1)(viii); Pls.' Br. 20-21. Plaintiffs criticize the Forest Service's finding that "[t]here are no known Native American or Alaska Native religious or cultural sites within the project area." Pls.' Br. 20-21 (citing DM 20). But this finding was supported by a comprehensive Cultural Resource Survey that the Operator has prepared for the Forest Service's analysis. A Level III Cultural Resource Survey of the Pete Lien and Sons Rochford Exploration Project at 1 ("Survey"), attached as Exhibit 2.

The Survey also acknowledged the traditional cultural property Pe'Sla, which is nearby but does not overlap the Project area. *Id*. at 35. The Survey explained that all of the recorded National Register of Historic Places sites associated with Pe'Sla are within Pe'Sla proper. *Id*. Further, the Survey assessed visual impact from Pe'Sla to all bore holes for the Project and found that the bore holes would create no temporary visual impacts on Pe'Sla. *Id*. Based on the findings in the Survey, it was reasonable for the Forest Service to find that "[t]here are no known Native American or Alaska Native religious or cultural sites within the project area." DM 20.

Additionally, the Project authorizes no exploratory drilling or ground-disturbing activity in Pe'Sla, and the Forest Service considered access to the Project area and traffic patterns and how that would impact the Pe'Sla site. Project-related traffic utilizes existing road systems to the north and east of Pe'Sla and does not rely on South Rochford Road, which traverses the Pe'Sla area. DM

1-2 ("Access to the project area will utilize NFS roads (NFS 190, 125, and 132) and overland two track trails wherever feasible."). Thus, the location and Project access routes, as authorized in the DM, further demonstrate that the Forest Service reasonably concluded that there is no uncertainty regarding the potential effect from the Project on Pe'Sla—the effect is not significant.

Plaintiffs respond by relying on declarations to claim noise from the Project will disrupt cultural and religious uses of Pe'Sla. Pls.' Br. 21 (citations omitted). But Plaintiffs declarations cannot be considered on the merits of this action because this is an APA case that is limited to the agency's Administrative Record. *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004) ("It is well-established that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision."). Although the Forest Service has not yet lodged its administrative record, it is clear that Plaintiffs' declarations cannot be considered because they are post-decisional and were not before the agency when it issued the DM. Further, a temporary noise impact on Native American or Alaska Native religious or cultural sites does not equate to existence of an extraordinary circumstance.[3] As explained above, for extraordinary circumstances to exist, there must be reasonable uncertainty about whether the degree of the effect is significant. Plaintiffs have identified no evidence that effects from this Project on Pe'Sla rise to this level.

Plaintiffs allege the Forest Service did not consider a wide enough area when determining whether extraordinary circumstances were present regarding Native American or Alaska Native religious or cultural sites. Pls.' Br. 21-22. But Plaintiffs are mistaken—through the survey, the Forest Service analyzed the entire "Area of Potential Effect" ("APE") for Native American or

---

[3] Noise level outputs of drilling operations will comply with noise restrictions for wildlife, and thus will likely not be disruptively loud. DM 13, 19.

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

16

Alaska Native religious or cultural sites. Survey 1. Despite Plaintiffs' statements to the contrary, the APE included a 60-meter buffer on either side of access roads for the Project, as well as buffers around the drill sites and the perimeter of the laydown yard/staging area. *Id*. Plaintiffs provide no compelling reason why this scope is unreasonable.[4] And the Forest Service's determination as to the geographic scope of its analysis is subject to substantial deference. *See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014) ("Identifying the appropriate geographic scope 'is a task assigned to the special competency of the appropriate agency[y].'" (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976)). At bottom, while the Black Hills National Forest may be generally considered a culturally significant landscape, the Operator has a statutory right to explore its claims on Forest Service lands, and the mere proximity of the Project area—on NFS lands that have not been withdrawn from mineral entry or development—to the Pe'Sla site does not in of itself create an extraordinary circumstance.

The Forest Service has reasonably determined that no extraordinary circumstances exist, and this determination is entitled to substantial deference.

### B.    Plaintiffs have not established irreparable harm.

Plaintiffs have further failed to demonstrate "that irreparable injury is *likely* in the absence of an injunction," *Winter*, 555 U.S. at 22. "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (affirming denial of preliminary injunction). Notably, courts cannot

---

[4] Plaintiffs raise a Memorandum of Understanding between the Forest Service and local Tribes concerning management of a 2-mile buffer around Pe'Sla. Pls.' Br. 21-22. Plaintiffs argue that, due to the MOU, the Forest Service must consider Pe'Sla as a Native American or Alaska Native religious or cultural site in the extraordinary circumstances analysis. *Id*. As explained more fully in the irreparable harm section below, the MOU does not restrict any activities within the 2-mile radius of Pe'Sla and thus is not relevant to the extraordinary circumstances analysis.

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

presume irreparable harm in an environmental case because it would be "contrary to traditional equitable principles" to do so.[5] *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) (noting that presumption of harm is unnecessary to protect the environment).

Here, Plaintiffs are concerned about disruptions to religious ceremonies, decrease in water quality and supply, and ecological harm, but Plaintiffs have not established that such speculative harms from this small exploration drilling project are "sufficiently likely" to occur without an injunction. *Amoco Prod.*, 480 U.S. at 545 (reversing Ninth Circuit's injunction against drilling because "injury to subsistence resources from exploration was not at all probable"); *United States v. Green Acres Enters., Inc.*, 86 F.3d 130, 133 (8th Cir. 1996) (vacating injunction because no evidence of harm to environment). And Plaintiffs' purported procedural harms under NEPA cannot alone establish irreparable harm. As the Supreme Court has made clear repeatedly, even where plaintiffs claim a procedural violation, they must still allege a "concrete interest that is affected by the deprivation' of the claimed right.'" *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (quoting

---

[5] Plaintiffs rely on *Richland/Wilkin Joint Powers Authority v. United States Army Corps. of Engineers*, 826 F.3d 1030, 1037 (8th Cir. 2016), Pls.' Br. 27, which in turn relied on Tenth Circuit precedent that held "harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure." *See Richland*, 826 F.3d at 1037 (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011) (relying on *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002))). But that precedent has been recognized as superseded by *Winter*. *See San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1240 (D. Colo. 2009) ("[A] presumption of irreparable environmental harm is not appropriate."); *see also Monsanto Co. v. Geertson Seed Farm*, 561 U.S. 139, 157-58 (2010) (rejecting presumption "that an injunction is the proper remedy for a NEPA violation except in extraordinary circumstances."). In any event, Plaintiffs must demonstrate, not merely allege, that the agency likely violated NEPA. "To hold otherwise would be tantamount to removing the irreparable-harm prong from the preliminary-injunction analysis in all NEPA cases." *Dine Citizens Against Ruining Our Env't v. Jewell*, No. 15-cv-209 JB-SCY, 2015 WL 4997207, at *47 (D.N.M. Aug. 14, 2015), *aff'd*, 839 F.3d 1276 (10th Cir. 2016); *accord Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005) ("[T]here is no presumption of irreparable harm in procedural violations of environmental statutes."); *Env't Def. Fund, Inc. v. Froehlke*, 477 F.2d 1033, 1036 (8th Cir. 1973) ("[N]ot every violation of NEPA gives rise to a right to blanket injunctive relief.").

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

18

*Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)) ("[D]eprivation of procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*— is insufficient to create Article III standing."). The Supreme Court could not have been clearer that no "thumb on the scales" in favor of an injunction is warranted where a NEPA violation is alleged. *Monsanto Co.*, 561 U.S. at 157-58. Instead, "[a]n injunction should issue only if the traditional four-factor test is satisfied." *Id.*

As explained below, Plaintiffs have not established "some concrete interest that is affected" and so their purported procedural harms under NEPA and the MOU are insufficient to establish irreparable harm, Pls.' Br. 9, 26-27; *Monsanto*, 561 U.S. at 157-58. In fact, the MOU does not confer any procedural or substantive rights to Plaintiffs. *See* MOU 4, Dkt. No. 12-5. Instead, it provides that the Forest Service and the Great Sioux Nation Tribes "will discuss potential stewardship agreements" that *could* include co-stewardship of Black Hills National Forest lands, including lands within 2-mile radius of Flag Mountain and Pe'Sla Tribal Trust lands," *id.* at 6. Thus, the MOU does *not* restrict any activities within the 2-mile radius of Pe'Sla but only commits the Forest Service and the Tribes to "discuss potential stewardship agreements," *id.* Plaintiffs' reliance on the MOU is therefore misplaced.

Plaintiffs have not established that the purported "noise and visual" disruptions are irreparable because they are speculative and at any rate would only be temporary. *See* Tilsen Decl. ¶ 15; *see* Gubbels Decl. ¶ 15. Plaintiffs' declarants who visited Pe'Sla while operations were ongoing in the Project area did not identify any disruptions. For example, NDN Collective's CEO and Founder Mr. Tilsen states that he visited Pe'Sla on April 1, April 10, April 15, April 21, and April 23, Tilsen Decl. ¶ 6, but makes no mention of drilling disruptions, *see id.* ¶ 14 (speculating that operations "will directly interfere" with prayer, ceremony, and cultural practices). Despite

exploratory drilling activities having started April 13, Lien Decl. ¶ 6, NDN Collective was not aware of operations until April 21, Big Eagle Decl. ¶ 16, presumably after surveilling the Project area, *see* Lien Decl. ¶ 19 (describing several security incidents involving NDN Collective at the Project area). *See also* Garriott Decl. ¶ 18 (alleging drilling and "related actions" are causing harm but failing to identify specific interruptions); Jarding Decl. ¶ 5 (same); *Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1349 (D. Mont. 2014) ("generalized allegations of an abstract environmental injury" are "insufficient to constitute irreparable harm required for an injunction.").

The drill sites are small and in "areas not easily visible from the surrounding area or trails." DM 8. Indeed, the highway intersecting the Pe'Sla generates more noise than the Project operations, which are occurring outside of the Pe'Sla. Lien Decl. ¶ 10. And any dust will be minimized by the Operator's use of roads. *Id.* 5. Thus, the alleged disruptions are not likely. But even if Plaintiffs could provide the requisite detail, the disruptions are temporary without lasting results.

Plaintiffs also fail to establish that the alleged harm to water quality, water supply, and the landscape are "at all probable," *Amoco Prod.*, 480 U.S. at 545. Without support, Plaintiffs charge that the Project is likely to contaminate the water but do not attempt to identify the supposed contaminates. *See* Pls.' Br. 26 (quoting Tilsen Decl. ¶ 6 and Jarding Decl. ¶¶ 10, 17). The Project, however, will use potable water, and "the drilling fluid and additives will be the same as those used in developing a domestic water well." DM 5; *see also* DM 4 ("Drilling additives would be limited to non-toxic, biodegradable materials approved for potable well development."). In other words, no possible contamination from the "open trenches" will occur. Jarding Decl. ¶ 12. Similarly, water consumption will be reduced by collecting it in either a tank or infiltration gallery

to recycle the water. DM 5. Thus, the risk of overusing the water supply is not "a concrete and immediate threat" as Plaintiffs contend. Jarding Decl. ¶ 12.

And the Project's design features will preserve the landscape. *See* DM 7 (describing measures to minimize disturbance to vegetation like locating lay-down areas on previously disturbed sites); DM 8 (explaining that equipment will be washed and inspected to prevent noxious weed infestations); DM 11 (shifting temporary access route to avoid sensitive plant species). The reclamation is expected to return disturbed areas to "the original condition to the extent possible." DM 15. In fact, the operator has experience with another drilling project that showed strong vegetation recovery within one year of the reclamation. Lien Decl. ¶ 13. Plaintiffs have not provided any reason to doubt that the Project's design features will maintain water quality, water supply, or the landscape. *See Native Ecosystems Council*, 40 F. Supp. 3d at 1349 (denying preliminary injunction because plaintiffs "fail[ed] to demonstrate measurable harm to any wildlife species or their habitat"). Plaintiffs alleged environmental injury is thus "vague, speculative, and insufficient to meet the standard for a showing of irreparable harm to [its] interests." *Id.*; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[S]peculation does not suffice.").

Likewise, Plaintiffs allege having seen "a drilling machine that is leaking oil and hydraulic fluid" at the Project site, but they provide no evidence to corroborate the equipment is in fact leaking oil and hydraulic fluid. Pls.' Br. 24 (quoting Tilsen Decl. ¶ 15). Tellingly, Plaintiffs submit no photos or details about how they confirmed oil and hydraulic fluid were leaking. Against Plaintiffs' mere speculation, the Project design features include containment procedures and mandatory equipment inspections daily. DM 9-10. Indeed, the Operator performs frequent maintenance on the equipment, ensuring that no leaks of oil or hydraulic fluid occur. Lien Decl. ¶

8. Plaintiffs provide no reason to doubt the Project's design features and Operator's frequent maintenance.

Compounding Plaintiffs' failure to meet their burden to allege irreparable harm is their delay in filing suit and seeking emergency injunctive relief. "[T]he determination of the reasonableness of a delay is context dependent." *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 998 (8th Cir. 2023). A delay is unreasonable where a movant seeks an injunction "after it would have been possible to preserve the status quo" and consequently defeats a movant's goal of preventing irreparable harm. *Id.* at 998. Here, Plaintiffs were well aware of the Forest Service's authorization of the Project the day it was issued on February 27, 2026. *See* https://www.facebook.com/ndncol (posting about the "permit to drill for graphite"); *see also* Ex. 3 (Plaintiffs' scoping comments). Still, Plaintiffs waited until after operations began—past the eleventh hour—to seek emergency relief. Lien Decl. ¶ 6 (noting that site work began March 27, 2026). Plaintiffs' delay in requesting injunctive relief undermines any allegation of irreparable harm. *See Crow Creek Sioux Tribal Farms, Inc. v. U.S. I.R.S.*, 684 F. Supp. 2d 1152, 1158 (D.S.D. 2010) (finding six-week delay from notice of action until moving for temporary restraining order "may be viewed as indicating that the Plaintiffs would not suffer irreparable harm without the injunctive relief."). The Court should deny Plaintiffs' Motion.

### C.     The balance of equities and public interest favor allowing the Project to proceed.

When one party is a United States agency, the public interest and the agency's interest merge, and the public interest weighs in favor of the agency's decision. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A federal court must deny a preliminary injunction, even where irreparable injury to the movant exists, if the injunction is contrary to the public interest. *See Winter*, 555 U.S. at 22-23; *see e.g.*, *Klamath-Siskiyou Wildlands Ctr. v. Grantham*, 785 F. App'x 467, 469 (9th Cir.

2019) (finding district court abused its discretion when it issued a preliminary injunction without paying "particular regard for the public consequences").

The Court may not "abandon a balance of harms analysis just because a potential environmental injury is at issue." *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008), *overruled on other grounds*. After all, "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (reversing preliminary injunction and remanding to consider balance of equities).

Here, Congress has decided that mineral development is in the public interest, which favors allowing the Project to proceed. The General Mining Act provides the statutory right to prospect, explore, and develop mineral projects on public lands. 30 U.S.C. § 22 ("[A]ll valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase . . . ."); DM 2. "The obvious intent was to reward and encourage the discovery of minerals that are valuable in an economic sense." *United States v. Coleman*, 390 U.S. 599, 602 (1968).

Recognizing the importance of some minerals over others, the U.S. Geological Survey prepares a list of "critical minerals" every year. *See Final 2025 List of Critical Minerals*, 90 F.R. 50,494-01 (Nov. 7, 2025). Graphite is a "critical mineral," which the Energy Act of 2020 defines as serving "an essential function in 1 or more energy technologies, including technologies that produce, transmit, store, and conserve energy" and "has a high risk of a supply chain disruption," 30 U.S.C. § 1606. "Critical minerals are essential for national security, economic stability, and supply chain resilience because they underpin key industries, drive technological innovation, and

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

support critical infrastructure vital for a modern American economy." *Final 2025 List of Critical Minerals*, 90 F.R. 50,494-01 (Nov. 7, 2025).

Pete Lien and Sons, a family-owned business, has held the unpatented mining claims at issue in this case for almost a decade. Lien Decl. ¶¶ 2-3. In June 2024, the company submitted its plan of operations to the Forest Service to search for graphite materials. *Id.* ¶ 3. After a lengthy process that involved Tribal coordination and public input, DM 21-22, the Forest Service approved Pete Lien and Sons' surface use of Forest lands in connection with exploratory drilling operations with mandatory design features to minimize adverse environmental impacts on Forest resources, DM 4-17. Exploratory drilling has been underway for over two weeks now. Lien Decl. ¶ 6. Delaying work now could cause a complete shutdown of operations because the Decision Memo limits the Project to specific times of the year to minimize the impact on wildlife. *See* DM 12-14; Lien Decl. ¶ 17. "Given these restrictions, any delay could make it impossible to complete the drilling and reclamation within the one-year timeframe." Lien Decl. ¶ 17. In addition, any delay would be costly. *See* Lien Decl. ¶ 16; *Amoco Prod.*, 480 U.S. at 545 (vacating preliminary injunction because "on the other side of the balance of harms was the fact that the oil company petitioners had committed approximately $70 million to exploration to be conducted during the summer of 1985 which they would have lost without chance of recovery had exploration been enjoined.").

In comparison to the speculative and temporary harms claimed by Plaintiffs, the public interest and balance of equities favor allowing the Project to proceed.

**D.      The doctrine of unclean hands bars Plaintiffs from equitable relief.**

Finally, Plaintiffs should be barred from obtaining any relief due to the doctrine of unclean hands. That doctrine "bars relief to a party who has acted improperly or in bad faith in relation to

the controversy in issue." *Gateway, Inc. v. Companion Prods., Inc.*, 2002 DSD 27, ¶ 71, 320 F. Supp. 2d 912, 928 (D.S.D. 2002). The doctrine applies when the party seeking relief commits an "unconscionable act" related to the litigation. *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933). "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945). "Moreover, where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions." *Id.*

Plaintiff NDN Collective has "transgress[ed] equitable standards" directly related to the Project challenged in this case by occupying the site of the operations and forcing the operations to halt. Lien Decl. ¶¶ 18-19 (detailing NDN Collective's unlawful trespasses); *see also* https://www.facebook.com/ndncol (posting about the protest halting operations). This clear disrespect for and disavowal of the judicial process should not be countenanced. *See Precision Instrument*, 324 U.S. at 819 ("Such inequitable conduct impregnate[s] [Plaintiffs'] entire cause of action and justifie[s] dismissal by resort to the unclean hands doctrine.").

**E.      If the Court enjoins the activities, Plaintiffs are required to post a bond.**

Although Plaintiffs have not met their burden to show they are entitled to emergency injunctive relief, if the Project is enjoined, the Court should require Plaintiffs to post a meaningful bond.

Federal Rule of Civil Procedure 65(c) preconditions the issuance of a preliminary injunction on "the movant giv[ing] security in an amount that the court considers proper to pay the costs and damages sustained by any party to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The rule is phrased in mandatory terms and requires an applicant for a restraining

DEFS.' RESP. TO PLS.'
MOT. FOR TEMP. RESTRAINING OR. AND PRELIM. INJ.

25

order or preliminary injunction to provide security as a condition precedent to receiving relief. *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976) (noting that the court need only look to the language of Rule 65(c) to dismiss applicant's contention that the trial court should not have required a bond); *Telex Corp. v. IBM*, 464 F.2d 1025 (8th Cir. 1972) (dissolving a preliminary injunction where the trial court, inter alia, failed to require the giving of security by the applicant as required by Rule 65(c)).

Other federal circuits have similarly recognized the mandatory nature of Rule 65(c). *See Hopkins v. Wallin*, 179 F.2d 136 (3d Cir. 1949) (vacating preliminary injunction because posting of a bond was a condition precedent to operation of an injunction); *Maryland Dep't of Human Res. v. Dep't of Agric.*, 976 F.2d 1462, 1482 fn. 21 (4th Cir. 1992) (listing several federal cases for its proposition that failure to require a bond pursuant to Rule 65(c) constitutes reversible error); *Chatz v. Freeman*, 204 F.2d 764, 768 (7th Cir. 1953) (finding trial court committed reversible error by not requiring applicant of temporary restraining order to provide security in accordance with Rule 65(c); *Atomic Oil Co. of Okl. v. Bardahl Oil Co.*, 419 F.2d 1097, 1099 (10th Cir. 1969) (stating giving of security is mandatory under Rule 65(c)). Indeed, the United States Supreme Court has noted that trial courts can avoid the inconvenience of interlocutory injunctions by attaching conditions to the award, such as the requirement of an injunction bond conditioned upon payment of any damage caused by the injunction if the plaintiff's contentions are not sustained. *Yakus v. United States*, 321 U.S. 414, 439 (1944).

An examination of the text and precedent surrounding Rule 65(c) leaves little doubt that Plaintiffs are required to give security before they are entitled to a preliminary injunction. Before it issues a preliminary injunction, the government respectfully requests that this Court require Plaintiffs to immediately post a security bond in an amount that will be sufficient to repay the

costs incurred for any delay. *See* Lien Decl. ¶ 16.

## VII. CONCLUSION

The Court should deny Plaintiffs' Motion for a Preliminary Injunction because Plaintiffs have not met their burden to show a likelihood of success on the merits of their NEPA claim or their burden to demonstrate that the Project will result in irreparable harm to their interests. Nor have Plaintiffs demonstrated that a balance of the equities supports preliminarily enjoining the Project, or that a preliminary injunction would be in the public interest. For each of these reasons, the Court should deny Plaintiffs' Motion.

Dated: May 1, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division


*/s/   Krystal-Rose Perez*
HAYLEY A. CARPENTER
KRYSTAL-ROSE PEREZ
Trial Attorneys (Carpenter: CA Bar No. 312611)
(Perez: TX Bar No. 24105931)
Natural Resources Section
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
(202) 598-3362 (Carpenter)
(202) 532-3266 (Perez)
hayley.carpenter@usdoj.gov
krystal-rose.perez@usdoj.gov

*Attorneys for Defendants*